**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
 ------------------------------------------------------ X

Towaki Komatsu,

                       Plaintiff,

        -vs-

The City of New York, NYPD Detective Nicholas Mason
(shield #: 6995), NYPD Officer Baez (shield #: 5984), NYPD
Officer Hansen (shield #: 4028), NYPD Officer Charles Dean,
Michael Finnel, NYPD Officer Hill (shield # 53), Joshua
Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard,
NYPD Lieutenant Ralph Nieves, Nick Gulotta, Jessica Ramos,
Bill de Blasio, James O'Neill, NYPD Inspector Howard
Redmond, Marco Carrion, Cyrus Vance, Jr., Lawrence Byrne,
Jr.

- All of the defendants listed above who are people are being
  sued in their individual and official capacities,

                     Defendants.

 ------------------------------------------------------ X

**Case #: 20-cv-8251**

**AMENDED COMPLAINT**

**JURY DEMAND**

## TABLE OF CONTENTS

I.    Preliminary Remarks .................................................................................... 3

II.   Jurisdiction ................................................................................................. 10

III.  Parties ........................................................................................................ 11

IV.   Background Facts ........................................................................................ 20

      A.  Facts about my testimony to the City Council on 10/2/17 .................. 37

      B.  Facts about efforts that I made by talking with Defendants Cyrus Vance, Jr.
          and Lawrence Byrne, Jr. on 10/3/17 to be able to attend the Mayor's 10/4/17
          town hall ........................................................................................... 41

      C.  Facts about my attendance on 10/2/17 at the publicity stunt that Letitia
          James conducted about labor rights in front of City Hall ................... 57

      D.  Facts about preparations that I made with Ritchie Torres' staff in advance to
          be able to attend the Mayor's 10/4/17 town hall ............................... 58

 V.   Legal Standards and Additional Background Facts ....................................... 59

VI.   Statement of Facts ..................................................................................... 112

      A.  Facts about the press conference that was conducted on 10/3/17 in front of
          City Hall that victims of NYPD abuse conducted and concerned reforming
          the NYPD as I was illegally prevented from attending it .................... 112

      B.  Facts about the Mayor's 10/4/17 town hall ...................................... 116

VII.  Causes of Action ...................................................................................... 124

VIII. Jury Demand ............................................................................................ 133

 IX.  Prayer for Relief ....................................................................................... 133

Plaintiff Towaki Komatsu (hereinafter referred to in the first-person as "I", "me", and "my"), proceeding pro se in this action, does hereby state and allege all that follows in this pleading.

## PRELIMINARY REMARKS

1.   The following applies throughout this complaint in the interests of brevity:

   a.   Acronyms and aliases in the second column of the following table will be used throughout this pleading instead of the entries in the third column to which they correspond:

| # | Abbreviation | Corresponds To |
|---|---|---|
| 1 | Bronx DA | Bronx District Attorney's office |
| 2 | CCRB | New York City Civilian Complaint Review Board |
| 3 | City Council | New York City Council |
| 4 | Defendant City | Defendant City of New York |
| 5 | DHS | New York City Department of Homeless Services |
| 6 | DOE | New York City Department of Education |
| 7 | DOI | New York City Department of Investigations |
| 8 | DOJ | U.S. Department of Justice |
| 9 | DSS | New York City Department of Social Services |
| 10 | FOIL | Freedom of Information Law |
| 11 | FRCP | Federal Rule of Civil Procedure |
| 12 | HRA | New York City Human Resources Administration |
| 13 | IAB | The NYPD's Internal Affairs Bureau |
| 14 | DOJ | The U.S. Department of Justice |
| 15 | The Mayor | New York City Mayor Bill de Blasio |
| 16 | Mayor's 4/27/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, New York City Councilman Jimmy Van Bramer, and other government officials as a mostly traditional public forum on 4/27/17 in Long Island City in Queens that was subject to New York State's Open Meetings Law and was used a campaign event to support the Mayor's re-election interests that I was illegally barred from attending while I had active litigation against HRA. |

| 17 | Mayor's 5/23/17 resource fair | The public resource fair meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, and other government officials as a mostly traditional public forum on 5/23/17 inside of the Bronx Supreme Court. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted. |
|----|----|----|
| 18 | Mayor's 9/8/17 public hearing | The public hearing that the Mayor conducted on 9/8/17 at 2 pm in the Blue Room in City Hall that partly concerned proposed legislation about reforming the NYPD as I was illegally prevented from attending that hearing. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor conducted. |
| 19 | Mayor's 9/14/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, New York City Councilman Chaim Deutsch, and other government officials as a mostly traditional public forum on 9/14/17 at 2525 Haring Street in Brooklyn. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it from within the room in which it was conducted while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted. |
| 20 | Mayor's 9/26/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, former New York City Councilman Dan Garodnick, and other government officials as a mostly traditional public forum on 9/26/17 at 245 East 56th Street in Manhattan. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it from within the room in which it was conducted while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted. |

| 21 | Mayor's 9/27/17 resource fair | The public resource fair meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, and other government officials as a mostly traditional public forum on 9/27/17 at 3940 Broadway in Manhattan. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted. |
| 22 | Mayor's 9/28/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, former New York City Councilwoman Melissa Mark-Viverito, and other government officials as a mostly traditional public forum on 9/28/17 at 1833 Lexington Avenue in Manhattan. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted. |

| 23 | Mayor's 10/4/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, former New York City Councilman Ritchie Torres, and other government officials as a mostly traditional public forum on 10/4/17 at 2452 Washington Avenue in the Bronx. That public forum was subject to New York State's Open Meetings Law. I was illegally barred from attending that public forum: |
|---|---|---|
| | | **a)** While I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted, |
| | | **b)** Just 1 day after Defendants Mason and Hansen illegally prevented me from attending a public press conference in front of City Hall that concerned reforming the NYPD. |
| | | **c)** Just 1 day after both Manhattan District Attorney Cyrus Vance, Jr. and Lawrence Byrne, Jr. informed me during a meeting that was conducted at the New York City Bar Association that was partly recorded on audio that they would willfully violate their Fourteenth Amendment affirmative legal duty as law-enforcement officials to intervene on my behalf to uphold my constitutional rights by refusing to do their jobs as I apprised them of crimes that members of the NYPD were committing against me at public forums that the Mayor was conducting and they told me then that they would not do anything about that. |
| | | **d)** Just 2 days after I testified to New York City Councilman Eric Ulrich and others during the public hearing that the City Council's Committee on Veterans conducted in City Hall partly about being illegally barred from public forums that the Mayor conducted. |
| 24 | Mayor's CAU | The Mayor's Community Affairs Unit |
| 25 | Mr. Banks | HRA Commissioner Steven Banks |

| 25 | My HRA lawsuit | The hybrid lawsuit that I commenced against HRA in January of 2017 that corresponds to _Komatsu v. New York City Human Resources Administration_, No. 100054/2017 (Sup. Ct., New York Cty.) and is being appealed. I asserted claims in that case that my claims in this case relate back to and amplify. Prior to 6/8/17, I asserted claims in that case that concerned illegal acts and omissions that were committed against me by defendants in this action that caused me to have been illegally barred from attending both the Mayor's 4/27/17 town hall and the Mayor's 5/23/17 public resource fair meeting. |
| --- | --- | --- |
| 26 | My X1 lawsuit | The related case that I commenced against the City of New York, Defendant Nieves, and others in April of 2018 that corresponds to the ongoing case of _Komatsu v. City of New York_, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.) that my claims in this case relate back to and amplify. The judges in that case refused to grant me sufficient time to file a further amended complaint in that case that would have otherwise enabled me to assert my claims in that case instead of in this case. In fact, Judge Lorna Schofield explicitly directed me to instead commence a new civil action for additional claims that I sought to assert in that case. |
| 27 | My X2 lawsuit | The related case that I commenced against the City of New York, Mr. Banks, and others on 8/14/20 that corresponds to the ongoing case of _Komatsu v. City of New York_, No. 18-cv-6510(LLS)(S.D.N.Y.) that my claims in this case relate back to and amplify. |
| 28 | My X3 lawsuit | The related case that I commenced against the City of New York, Defendant Nieves, Hansen, and others on 8/29/20 that corresponds to the ongoing case of _Komatsu v. City of New York_, No. 18-cv-7046 (ER)(S.D.N.Y.) that my claims in this case relate back to and amplify. |
| 29 | My X4 lawsuit | The related case that I commenced against the City of New York as well as Defendants, Mason, Nieves, and others on 9/13/20 that corresponds to the ongoing case of _Komatsu v. City of New York_, No. 18-cv-7502(S.D.N.Y.) that my claims in this case relate back to and amplify. |
| 30 | My X5 lawsuit | The related case that I commenced against the City of New York as well as Defendants, Mason, Nieves, and others on 9/25/20 that corresponds to the ongoing case of _Komatsu v. City of New York_, No. 18-cv-8004(S.D.N.Y.) that my claims in this case relate back to and amplify. |
| 31 | NTT Data, Inc. | NTT |
| 32 | NYAG | New York State Attorney General's Office |
| 33 | OCA | New York State Office of Court Administration |

| 34 | OTDA | The New York State Office of Temporary and Disability Assistance |
| 35 | Second Circuit | United States Court of Appeals for the Second Circuit |
| 36 | Urban | Urban Pathways, Inc. It is the slumlord for the building in which I reside. |

2.  Every reference that I make in this pleading that concerns my efforts to have attended the Mayor's 10/4/17 town hall concerns those that I made to lawfully attend it from within the room in which it was conducted as it was conducted, shortly before it began, and shortly after it ended.

3.  References to HRA, DHS, and DSS will be used interchangeably in this pleading for simplicity.

4.  The illegal acts and omissions that were committed against me on 10/3/17 and 10/4/17 at the sites of public forums that my claims in this complaint concern were committed in relation to my efforts to have exercised my legal right to have done the following:

    a.  Lawfully attended those public forums in accordance with my constitutional rights.

    b.  Exercised the full extent of my rights while attending them partly by engaging in protected whistleblowing about a broad array of matters of public concern and private matters.

5.  This is a civil rights action to vindicate my rights in response to illegal acts and omissions that were committed against me on 10/3/17 and 10/4/17 at the sites of public forums that were conducted at City Hall on 10/3/17 and in the Bronx on 10/4/17 in relation to my efforts to have lawfully attended them while Defendant Howard Redmond was **a)** the head of the Mayor's NYPD security detail and **b)** the primary defendant in _Sherrard v. City of New York,_ _No. 15-cv-7318 (MB) (S.D.N.Y. Jun. 13, 2018)._ Since 4/27/17, I was aware of his status as the defendant in _Sherrard v. City of New York_ by having conducted research about him then in the wake of illegal acts and omissions that he and others committed against me on 4/27/17

that caused me to be illegally barred from attending the Mayor's 4/27/17 town hall in flagrant violation of my constitutional rights and other applicable laws. Those who committed such illegal acts and omissions against me on 10/3/17 and 10/4/17 mostly did so as part of a conspiracy in retaliation against me that was mainly for protected whistleblowing and litigation activities that I continued to be engaged in against Mr. Redmond, themselves, other members of the NYPD, members of the Mayor's staff, HRA, HRA's business partners, Mr. Banks, New York State court officers, and others. Such protected whistleblowing and litigation activities that this concerns were largely related to my HRA lawsuit and earlier illegal acts and omissions that were committed against me by the following people in relation to my efforts that I previously undertook to lawfully attend earlier public forums that were partly conducted by the Mayor, Mr. Banks, and others that included public town hall meetings, public resource meetings, and public hearings, and publicity stunts that the Mayor conducted on 7/25/17 in a public area of a subway station:

    a. Those who committed the illegal acts and omissions against me on 9/26/17, 9/27/17, and 9/28/17 at the sites of the Mayor's **a)** 9/26/17 town hall, **b)** 9/27/17 resource fair, and **c)** 9/28/17 town hall.

    b. Their colleagues in the NYPD and among the Mayor's staff as well as among New York State court officers that they partnered with on 5/23/17 to commit illegal acts and omissions against me as I lawfully attempted to attend the Mayor's 5/23/17 public resource fair meeting that was conducted inside of the Veterans' Memorial Hall chamber within the Bronx Supreme Court during the U.S. Navy's annual "Fleet Week" event while I continued to be a U.S. Navy veteran.

6. While committing such illegal acts and omissions against me on 10/3/17 and 10/4/17 that my

claims in this complaint concern, that was done to extend a campaign of harassment, retaliation, and unequal and discriminatory acts against me at public forums dating back to 4/27/17 that the Mayor and other government officials conducted with members of the public in a collaborative manner as the Mayor and such other government officials were running for re-election and using those public forums to try to improve their re-election prospects partly by trying to attract publicity.

7. The illegal acts and omissions that were committed against me on 10/3/17, 10/4/17, and on earlier dates that go as far back as 4/27/17 at public forums that the Mayor conducted with other government officials and continued long after 10/4/17 at additional public forums that they conducted were acts of voter suppression, voter fraud, whistleblower retaliation, a malicious and naked abuse of process, illegal selective-enforcement, standardless discretion, viewpoint discrimination in violation of the Hatch Act, my constitutional rights, federal and New York State criminal statutes, New York State's Open Meetings Law, and other applicable laws that were against me directly and others indirectly largely by illegally depriving the public of relevant and significant information that it could use to make informed voting decisions during the 2017 New York City government elections that I sought to lawfully and widely broadcast by attending public forums that the Mayor conducted within the rooms in which they were conducted while they were recorded on video that could amplify and extend the reach of the critical views against the Mayor's administration, the NYPD, the Mayor's administration's business partners, and whistleblower news censors in journalism that I sought to lawfully express.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C.

§§1331 and 1343. This action is brought pursuant to 42 U.S.C. §§1983, 1985, 1988 and the First, Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution.

2.      My claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§2201 and 2202, FRCP Rules 57 and 65, and the general legal and equitable powers of this Court.

3.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because I reside in the Bronx and the illegal acts and omissions that were committed against me that this complaint concerns occurred in Manhattan and the Bronx.

4.      An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. §1988.

5.      Consistent with the requirements of New York General Municipal Law § 50-e, I filed a timely Notice of Claim with the New York City Comptroller within 90 days of the accrual of my claims under New York law.

6.      My claims have not been adjusted by the New York City Comptroller's Office.

## PARTIES

1.      I am, and was at all times relevant to this action, a resident of Bronx County in the State of New York. I am also a U.S. Navy veteran, who swore to defend the U.S. Constitution against all of its enemies indefinitely and without exceptions. I have honored that oath and continue to do so.

2.      At all times relevant herein Defendant Bill de Blasio and Defendant James O'Neill were employees of the City of New York.

3.      At all times relevant herein, **a)** Defendant de de Blasio has been the Mayor of the City of New York, **b)** Defendant James O'Neill was the commissioner of the NYPD, and **c)** Defendant Lawrence Byrne, Jr. was the Deputy Commissioner for Legal Matters for the NYPD. As the commissioner of the NYPD, Defendant O'Neill was among others who were responsible for how

the NYPD operated, how the NYPD's personnel were trained, how they were supervised, and how they were disciplined. In his capacity as the Deputy Commissioner for Legal Matters for the NYPD, Defendant Byrne, Jr. was similarly responsible for having the members of the NYPD operate within the bounds of applicable laws while they were on-duty as members of the NYPD. Defendant de Blasio was also partly responsible for how the NYPD operated and was supervised at all times relevant herein partly by having the power to replace Defendant O'Neill as the NYPD's commissioner and set the budget for the NYPD.  In regards to this point, Mr. de Blasio was recorded on video on 11/30/17 during the public town hall meeting that he conducted in Queens as he stated the following:

"If you have a problem with policing, I am ultimately responsible."

4.      Mr. De Blasio is shown and heard as he made that remark in that video at the elapsed time of 1 hour, 49 minutes, and 19 seconds. That video recording is available on the Internet at https://www.youtube.com/watch?v=CRV0IKbg5tQ.

5.      Defendant City of New York is a municipal corporation duly incorporated and authorized under the laws of the State of New York pursuant to §431 of its Charter. The City of New York is authorized under the laws of the State of New York to maintain a police department, the NYPD, which is supposed to act as its agent in the area of law-enforcement and for which it and the Mayor are ultimately responsible. The City and the Mayor both assume the risks incidental to the maintenance of a police force and the employment of police officers.

6.      Defendants Mason, Hansen, Baez, Dean, Finnel, Hill, Nieves, O'Neill, Redmond, and Byrne, Jr. were at all times relevant herein officers, employees, and agents of the NYPD and the City of New York.

7.      Defendants Nieves, O'Neill, and Byrne, Jr. have retired from the NYPD.

8.      Defendants Dean and Finnel were recorded in video recordings that I recorded on 10/4/17

as they committed illegal acts and omissions against me that concerned my efforts to lawfully

attend the Mayor's 10/4/17 town hall. Those defendants appear in the video recordings listed in

the following table at the elapsed time shown:

| # | Defendant | Video | Elapsed Time |
|---|-----------|-------|--------------|
| 1 | Dean | IMG  2368.MOV | 1 second |
| 2 | Finnel | IMG  2366.MOV | 16 seconds |

9.      Defendants Dean and Finnel are shown in the following table at the elapsed times in the

video recordings to which I just referred:

| # | Defend- ant | Image | Comments |
|---|-------------|-------|----------|
| 1 | Dean |  | He is the bald Black male member of the NYPD with a beard as he wore a blue shirt and had his right arm extended to his right as he stood near the entrance to the building that hosted the Mayor's 10/4/17 town hall as he then stood in front of Defendants Hansen and Mason. |

| 2 | Finnel |  | | He is stood near the entrance to the building that hosted the Mayor's 10/4/17 town hall as I recorded this video. |

10.     Upon information and belief, Defendants Redmond, Nieves, and Mason were at all times relevant herein members of the NYPD security detail for the Mayor.

11.     At all times relevant herein, Mr. Redmond helped to direct and supervise how the Mayor's NYPD security detail operated.

12.     The next to screenshots are from video recordings that were recorded on 10/4/17 of Joshua Cortez. The first screenshot shows him as he stood next to Defendant Mason at 6:55 pm in the doorway of an entrance to the building that hosted the Mayor's 10/4/17 town hall as he was among those who were illegally preventing me from attending that town hall after he refused to issue me an admission ticket for that public forum while I had been lawfully waiting in line

with others.





13.     Defendant Cortez is another male member of the Mayor's staff who issued admission

tickets on 10/4/17 for the Mayor's 10/4/17 town hall to people who waited in line to be granted access to the building that hosted that town hall as he, John Doe1, and Defendant Gulotta illegally refused to issue me such an admission ticket.

14.    At all times relevant herein, Defendant Vance, Jr. has been the Manhattan District Attorney and has been responsible for enforcing applicable laws that include New York State's Penal Code in New York City by commencing prosecutions.

15.    At all times relevant herein, Defendants Gulotta and Marco Carrion were employees of the City of New York who worked for the Mayor's CAU as Mr. Carrion was the commissioner of the Mayor's CAU.

16.    At all times relevant herein, Defendants Jessica Ramos, Joshua Cortez, and John Doe1 10/4/17 were employees of the City of New York who worked for the Mayor's office.

17.    Bronx DA John Doe bodyguard is a man who I talked with either near the curbside or in the street in front of the entrance to the school that hosted the Mayor's 10/4/17 town hall shortly before it began as Bronx DA John Doe bodyguard then appeared to be a bodyguard for Bronx District Attorney Darcel Clark, who attended that town hall and arrived a short time later to that location. The actual identity of "Bronx DA John Doe bodyguard" can be determined by having the Bronx DA provide this Court the identity of the male who served as the bodyguard and escort for Darcel Clark on 10/4/17 for the Mayor's 10/4/17 town hall who talked with me on that date in that location.

18.    The defendants in this action who are people violated oaths that they were required to take through the illegal acts and omissions that they committed against me on 10/3/17 and 10/4/17 in relation to my efforts to lawfully attend **a)** the Mayor's 10/4/17 town hall and b) a public press conference that was conducted at 12 pm in front of the main steps to City Hall that

concerned reforming how the NYPD operated. The specific oaths that the defendants violated

then in regards to me were those that they were required to take upon **a)** joining the NYPD

and/or **b)** otherwise working for the City of New York. Those oaths required them to swear or

affirm that they would perform their duties as members of the NYPD and/or other personnel of

the City of New York in accordance with the U.S. Constitution and New York State Constitution

to the best of their abilities. In regards to this point, the Mayor's press office made a transcript

available on the Internet of a swearing-in ceremony for new members of the NYPD that the

Mayor presided over on 10/8/15. That transcript is available on the Internet at

https://www1.nyc.gov/office-of-the-mayor/news/702-15/transcript-mayor-de-blasio-delivers-

remarks-nypd-swearing-in-ceremony.

19.     The next screenshot shows an excerpt from that transcript that reflects how those new

members of the NYPD pledged to uphold the U.S. and New York Constitution and to faithfully

discharge their duties as members of the NYPD to the best of their abilities after the defendant in

this action who are members of the NYPD most likely did the same before they committed

illegal acts and omissions against me that this action concerns. Hindsight therefore confirms that

they lied in the oaths that they took upon joining the NYPD to become part of a criminal mob as

liars and con artists instead of joining the ranks of actual law-enforcement.

**Mayor:** I do hereby pledge – I'm sorry, I should say repeat after me – I do hereby pledge and declare –

**Recruits:** I do hereby pledge and declare –

**Mayor:** – to uphold the Constitution of the United States –

**Recruits:** – to uphold the Constitution of the United States –

**Mayor:** – and the Constitution of the State of New York –

**Recruits:** – and the Constitution of the State of New York –

**Mayor:** – and faithfully discharge my duties –

**Recruits:** – and faithfully discharge my duties –

**Mayor:** – as a New York City Police Officer –

**Recruits:** – as a New York City Police Officer –

**Mayor:** – to the best of my ability –

**Recruits:** – to the best of my ability –

**Mayor:** – so help me God.

**Recruits:** – so help me God.

20.     In a similar vein, other personnel of the City of New York are required upon working for the City of New York by New York State Civil Service Law §62 to take and file an oath or affirmation in which they pledge and declare that they will support the U.S. and New York State Constitution and faithfully discharge the duties of their jobs with the City of New York to the best of their abilities.

21.     On a closely related note, the following shows the terms of New York City Charter Section 435(a) that address the legal duties that all members of the NYPD have and underscores the fact that the defendants in this action who were members of the NYPD between 10/3/17 and 10/4/17 committed illegal acts and omissions against me in relation to my claims in this case by flagrantly violating and disregarding their legal duties as members of the NYPD:

> "**The police department and force shall have the power and it shall be their duty to preserve the public peace, prevent crime, detect and arrest offenders, suppress riots,**

**mobs and insurrections, disperse unlawful or dangerous assemblages and assemblages which obstruct the free passage of public** streets, **sidewalks,** parks and places; **protect the rights of persons** and property, **guard the public health**, **preserve order at** elections and **all public meetings and assemblages**; subject to the provisions of law and the rules and regulations of the commissioner of traffic,* regulate, direct, control and restrict the movement of vehicular and pedestrian traffic for the facilitation of traffic and the convenience of the public as well as the proper protection of human life and health; **remove all nuisances in the public** streets, parks and **places**; arrest all street mendicants and beggars; provide proper police attendance at fires; inspect and observe all places of public amusement, all places of business having excise or other licenses to carry on any business; **enforce and prevent the violation of all laws and ordinances in force in the city**; and for these purposes **to arrest all persons guilty of violating any law or ordinance for the suppression or punishment of crimes or offenses**.

(boldface formatting added for emphasis)

22.     By committing the illegal acts and omissions against me that my claims in this action concern, the defendants who did so and were then personnel of the City of New York violated New York City Charter §1116 that requires them to be promptly fired and prohibited from working for the City of New York again.

23.     The individual defendants are being sued herein in their individual and official capacities.

24.     At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the NYPD and City of New York. They were acting for and on behalf of the NYPD, Mayor, Mr. Banks, HRA, and one another at all times relevant herein. While doing so, the defendants in this action who are members of the NYPD did so with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

25.     The individual defendants' acts hereafter complained of were carried out intentionally, recklessly, and oppressively with malice and egregious, callous, and wanton disregard of plaintiff's rights.

26.     At all relevant times, the individual defendants were engaged in joint ventures, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## BACKGROUND FACTS

1.     Prior to 10/4/17, I had face-to-face conversations with the following Defendants on the dates listed that partly concerned illegal acts and omissions that members of the NYPD and others committed against me since 4/27/17 at the sites of public town hall meetings, public resource fair meetings, and a public hearing that the Mayor conducted with others that were public forums that illegally caused me to be barred from attending them in violations of my constitutional rights and other laws that include 18 USC §245(b)(5), 18 USC §241, 18 USC §1513(e), NYPL §240.20, NYPL §240.26, NYPL §215.10, NYPL §175.25, NYPL §240.65, NYPL §195.00, New York City Charter §1116, New York State's Open Meetings Law, 42 USC §1983, 42 USC §1985, 42 USC §1986, and 5 U.S.C. §1502(a)(1):

   a.  Defendant O'Neill on 6/26/17.

   b.  The Mayor on both 7/16/17 and 7/18/17.

   c.  Defendant Vance, Jr. and Byrne, Jr. on 10/3/17.

2.      My 6/26/17 conversation with Mr. O'Neill was recorded on audio and witnessed by whistleblower news censors in journalism. My 7/16/17 and 7/18/17 conversations with the Mayor also were witnessed by whistleblower news censors in journalism that included Michael Garland and Gloria Pazmino. My 7/18/17 conversation with the Mayor was recorded on video.

3.      On 6/26/17, I talked with Defendant O'Neill at the New York City Bar Association in the presence of various whistleblower news censors in journalism during a meeting in which he was the primary speaker. Information about that meeting is available from the New York City

Bar Association's web site at http://www.nycbar.org/media-listing/media/detail/a-conversation-with-new-york-city-police-commissioner-james-p-oneill. The audio recording of that meeting that the New York City Bar Association arranged to be recorded is available on the Internet at http://dts.podtrac.com/redirect.mp3/www2.nycbar.org/mp3/Podcasts/media/police_commissioner_audio_2017-06-26.mp3.

4.      The next **screenshot** is from a video recording that I recorded on 6/26/17 at 8:35 am at the New York City Bar Association that shows **Defendant** O'Neill in it as he stood at a podium with microphones that had the names of various New York City news outlets on them.



5.      The fact that no one reported anything in the news about what I discussed with Mr. O'Neill on 6/26/17 **confirms** that journalism and freedom of the press in New York City just doesn't exist and claims to the contrary **are** utter lies. That video that I recorded during that meeting confirms that the following so-called news outlets had some of their personnel present at that 6/26/17 meeting:

PIX11News, 1010 WINS, NBC, CBS New York, WCBS 880, and ABC News

6.      The video recording that I recorded of Mr. O'Neill during that meeting that I just

discussed is available on the Internet at the following address:

        https://drive.google.com/file/d/1sofOzQmsQy_1_lkIglBTn9iZiGNwGNpL/view?usp=sha
        ring

7.      During that meeting on 6/26/17, I had two face-to-face conversations with Mr. O'Neill.

My first conversation with him during that it extends from the elapsed time of **a)** 32 minutes and

38 seconds from the beginning of the audio recording that the New York City Bar Association

recorded of that meeting to **b)** 33 minutes and 36 seconds in that recording. My second

conversation with him during that meeting extends from the elapsed time of **a)** 47 minutes and 4

seconds from the beginning of that recording to **b)** 49 minutes and 14 seconds.

8.      The following is entirely true and accurate about what Mr. O'Neill and I discussed during

that meeting:

        a.  I told him that I was a military veteran and reminded him that he used the comment of

            "a free and open society" in a speech that he gave during that meeting. I then

            pointedly asked him why members of the NYPD who were inside of the Bronx

            Supreme Court on 5/23/17 illegally directed court officers assigned to that courthouse

            to prevent me from attending the public resource fair meeting that the Mayor

            conducted in that courthouse on that date inside of the Veteran's Memorial Hall

            chamber within it and while members of the NYPD have no jurisdiction in

            courthouses because jurisdiction for law-enforcement in New York State courthouses

            belongs to New York State court officers instead of the NYPD. When he responded

            to that by claiming that he wasn't aware of that situation, I told him that I had a video

            recording that confirmed what I had just apprised him about had occurred and that I

            was willing to share that video recording with him if he so desired.

b. I asked him when members of the NYPD would stop violating civil rights by shoving military veterans as such veterans stood legally on empty public sidewalks while Mr. Redmond illegally discriminated against them by preventing them from attending public town hall meetings that the Mayor held. While asking him that question, I was referring to myself as such a military veteran who was illegally shoved and discriminated against as I referred to the public town hall meeting that the Mayor held on 4/27/17 in Long Island City in Queens. In response, Mr. O'Neill was blatantly evasive and deceitful by claiming that different issues applied to that question. When he asked what I was talking about in particular in regards to my question, I told him that I was talking about public meetings, New York State's Open Meetings Law, the U.S. Supreme Court decision that was issued in _Wood v. Moss_, 134 S. Ct. 2056, 572 U.S., 188 L. Ed. 2d 1039 (2014) that concerns viewpoint discrimination, and what was then Mr. Redmond's ongoing status as the primary defendant in _Sherrard v. City of New York_, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018).

c. I also asked Mr. O'Neill about why Mr. Redmond was still being allowed to be a member of the NYPD since he was violating my civil rights after he had violated Mr. Sherrard's civil rights. _Sherrard v. City of New York_ concerns an incident that occurred on 9/17/12 in which Mr. Redmond flagrantly violated Mr. Sherrard's constitutional rights on video before Mr. Redmond blatantly lied about that during a deposition on 5/19/17 and as he testified in that case in June of 2018. When Mr. O'Neill told me during that meeting that he would need to talk with Mr. Redmond about what I discussed with him (Mr. O'Neill) during it and that he wasn't aware of _Sherrard v. City of New York_, as he left that meeting, I offered to give him a printout

that I had with me and that contained information shown on its docket sheet that

listed the case number for *Sherrard v. City of New York* and other information about

that case. I believe that I handed that information instead to NYPD Detective James

Byrne as he escorted Mr. O'Neill out of that meeting and gave me his business card

then that appears as follows:



9.      A critically significant point about my conversation with Mr. O'Neill on 6/26/17 is that I

clearly put him on notice then that **members** of the Mayor's NYPD security detail were violating

my civil rights at public **forums** that the Mayor had been conducting and that Mr. O'Neill told

me in response that he would need to talk with Mr. Redmond about what I then discussed with

him about Mr. Redmond. As the NYPD's Commissioner, he certainly had the authority to issue a

standing order to Mr. Redmond to make certain that he and the rest of the Mayor's NYPD

security detail immediately stop violating the civil rights of New Yorkers at public forums.

Hindsight clearly confirms that Mr. O'Neill either didn't issue such an order or that such an

order was violated at my expense repeatedly and flagrantly thereafter by Mr. Redmond and other

members of the Mayor's NYPD security detail and others. On 4/27/17, Mr. Redmond told me at

the site of the Mayor's town hall then that he reported to Mr. O'Neill. The preceding discussion

is sufficient to establish that this Court's determinations about claims that I am asserting against

Mr. O'Neill in this pleading for supervisory liability must be in my favor because additional

illegal acts and omissions were committed against me in violation of my civil rights by Mr.

Redmond and other members of the Mayor's NYPD security detail after 6/26/17 at public

forums that Mr. O'Neill certainly had a realistic opportunity to prevent from occurring.

10.     The following relevant facts apply to what I discussed with Mr. O'Neill during that

meeting:

    a.   I later discovered from a written transcript and video recording that the New York

        City Law Department provided to me that concerned *Sherrard v. City of New York,*

        No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018) that Mr. Redmond committed perjury

        on 5/19/17 during a sworn deposition that he gave as he lied about a critically

        significant fact. The next screenshot shows the questions that were asked and the

        responses to them that were given that appear between lines 11 and 17 that appear on

        page 20 within the written transcript that was prepared from the deposition that Mr.

        Redmond gave on 5/19/17 in connection with *Sherrard v. City of New York*, No. 15-

        cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018). That transcript was provided to me by the

        New York City Law Department in response to a FOIL demand that I submitted to it

        and is available on the Internet at

        https://drive.google.com/open?id=12ATFhN0RVkrvlTjpINTPet57K1D4poiz. The

        answers shown on lines 13, 14, and 17 in that screenshot were answers that Mr.

        Redmond gave to the questions that are shown in it.

```
11        Q        The question is, why did you stop at
12   that location?
13        A        Because I was blocked by
14   bicyclists.
15        Q        And was Mr. Sherrard any of those
16   bicyclists that were blocking you?
17        A        Yes.
```

b. The New York City Law Department also provided me a critically significant video

recording that is available on the Internet at

https://drive.google.com/open?id=13dteIym5B27WAHrR2b_vrb68X8IDT_Ye in

response to a FOIL demand that I submitted to it that was recorded on 9/17/12 in

Manhattan on Lafayette Street by Leonard Street as Mr. Redmond recklessly drove a

black car with just one hand on its steering wheel in the middle of the roadway in the

direction of New York City Hall by the New York City Civil Court and New York

City Family Court. That video recording was presumably recorded by a member of

the NYPD who with Mr. Redmond and other members of the NYPD were stalking

Kalan Sherrard and other bicyclists. Kalan Sherrard was the plaintiff in *Sherrard v.*

*City of New York*, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018). The next

screenshot corresponds to what appears in the video that I just discussed at the

elapsed time of 10 seconds and confirms that **a)** Mr. Redmond was reckless driving a

black car with left hand off of its steering wheel in **the middle** of a roadway and **b)**

Mr. Sherrard was lawfully riding a bicycle on the **far-left** side of that roadway ahead

of 4 other bicyclists shown on the left as he appears in the top-left corner in that

screenshot. At that point, the distance between Mr. Redmond's car and the back of

Mr. Sherrard's bicycle clearly exceeded the lengths of 2 cars that appear on the right side of that road as Mr. Sherrard rode his bike directly next to the right of an area in which construction or renovation work was being done and may have endangered his safety as a bicyclists because of debris that may have possibly been in a bicycle lane that he was not required by law to use then. The fact that the sidewalk next to that bicycle lane was closed then because of construction or renovation work suggests that Mr. Sherrard was being courteous to pedestrians by letting them use that bicycle lane to offset the closure of that sidewalk.



c.  The next screenshot is from that same video and corresponds to the elapsed time of 18 seconds. The following is shown in it:

    i.  Mr. Redmond is shown in the lower-right area as he exited his car with a radio in his left hand.

    ii.  Mr. Sherrard is shown sitting on his bicycle while illegally stopped by 2

members of the NYPD on scooters or motorcycles in violation of his constitutional rights. The tires on those scooters or motorcycles were clearly wider than the tires on Mr. Sherrard's bicycle. This is relevant because thin tires on bicycles don't withstand coming in contact with debris on roadways as well as wider and thicker tires. One of the members of the NYPD who illegally stopped Mr. Sherrard drove through the bicycle lane on wide and thick tires to reach him. Also, this screenshot more clearly confirms by the existence of orange netting and barriers next to that bicycle lane that construction or renovation work was then taking place near it.



11.     On 6/21/17, Defendant Nieves was recorded on video as he stood in front of the building that hosted the town hall meeting that the Mayor conducted in Chinatown in Manhattan and illegally harassed an Asian woman as she was trying to lawfully attend that town hall with literature that she had. That video recording clearly shows Defendant Nieves illegally

confiscating literature from her in violation of her First Amendment and Fifth Amendment

rights. That video is available on the Internet at https://www.youtube.com/watch?v=KRur-

_QvbC0. What follows are a few screenshots from it. The next screenshot shows Mr. Nieves

giving that woman a hand signal to have her step toward him at the elapsed time of 32 seconds.



12.      The next screenshot shows that Asian woman standing near Mr. Nieves at the elapsed

time of 35 seconds as what clearly appears to be a press credential hung from her neck.



13.     The next screenshot shows that Asian woman standing near Mr. Nieves at the elapsed time of 1 minute and 6 seconds as she held papers that she had been carrying prior to meeting Mr. Nieves as he also then had his hands on those papers after she met him. She is shown standing next to Jane Meyer of the Mayor's office who was then looking at those papers.



14.     The next screenshot shows Mr. Nieves at the elapsed time of 1 minute and 9 seconds as he carried that Asian woman's papers after she left his wretched company



15.     On 6/23/17, a news organization named DNAInfo published a news article on the Internet

at https://www.dnainfo.com/new-york/20170623/lower-east-side/mayor-de-blasio-town-

hallmargaret- chin-aaron-foldenauer that is entitled "Security Swiped Political Pamphlets at

Mayor's Town Hall, Attendees Say" and was written by a journalist named Allegra Hobbs. That

article addressed the fact that multiple people who tried to attend the town hall meeting that the

Mayor conducted on 6/21/17 in Chinatown in Manhattan had literature illegally confiscated by

members of the NYPD as they underwent a security screening process to enter the building that

hosted that town hall.

16.     On 7/18/17, I was recorded on video during the public resource fair meeting that the

Mayor conducted in Kew Gardens in Queens with other government officials as I talked with the

Mayor face-to-face. That conversation occurred as I stood near Mr. Banks, Jessica Ramos, and in

front of whistleblower news censors in journalism named Gloria Pazmino and Michael Gartland.

Although the Mayor's office arranged to have a video recording to be recorded of that public

resource fair and that video recording certainly is a public record, the Mayor's office has illegally

concealed that video recording. It was only because I submitted a FOIL demand to the Mayor's office that it provided me a link to that video recording on the Internet prior to illegally removing that video recording from the Internet or otherwise disabling access to it. Prior to doing so, I downloaded a short clip from that video. The following is a link to that video clip on the Internet:

https://drive.google.com/open?id=1-ZUN22r8q4qARLEbMk8FVg4KuLqfTtcc

17.     Everything that I talked with the Mayor and Mr. Banks during that meeting were matters of public concern about which I intended to lawfully engage in protected whistleblowing against them and others during the town hall meeting that the Mayor conducted on 10/4/17 both while attending it and lawfully waiting in line on 10/4/17 with other members of the public next to the building in which it was conducted to be granted access to it. The next screenshot is from the elapsed time of 1 minute and 31 seconds in that 7/18/17 video and pertains to a discussion that I had with the Mayor that was about having him cancel the City of New York's business that taxpayers pay for that is with a company named NTT Data, Inc. that still subjects me to illegal wage-theft, fraud, and retaliatory employment blacklisting that dates back to 2012. Instead of cancelling that business, the Mayor's administration has unconscionably opted to extend it that keeps too much money in the wrong hands as people are now mightily struggling to make ends meet in New York City due to the Coronavirus pandemic and shouldn't have to support businesses that commit wage-theft. HRA has contracts with NTT.



18.     The next screenshot from that video corresponds to the elapsed time of 1 minute and 4 seconds in it as I asked the Mayor a **question** in a poorly phrased way as I meant to ask him if her could direct Mr. Banks to resolve my litigation against HRA in some way that was fair. The Mayor instead stonewalled me as he told me **that** his administration has a lot of litigation and "that is how we do things". That answer confirmed to me that he and his administration needed to be fired immediately.



19.     The next screenshot from that video corresponds to the elapsed time of 1 minute and 57 seconds in it as I apprised the Mayor that Mr. Redmond illegally prevented me from attending his 4/27/17 **town** hall meeting and that he was also then defending a federal civil rights lawsuit. In response, he claimed that he didn't' know anything about that and that he wouldn't talk with me further about lawsuits. That response further confirmed to me that he and his administration needed to be fired immediately. I was then referring to *Sherrard v. City of New York*.



20.     The next screenshot from that video corresponds to the elapsed time of 2 minute and 10 seconds and clearly shows both the Mayor and an unknown Black male member of his NYPD security detail harassing me and subjecting me to what is known as "simple assault" under applicable law. It shows this as a result of it showing that the Mayor tried to illegally reach over toward me and touch me near my right shoulder as the Black male member of his NYPD security detail put his right hand on my backpack before illegally pushing me away. That push was assault. Neither of them gave me a reasonable opportunity to first leave their wretched company without being illegally coerced by them to do so. The Mayor's illegal acts against me then confirmed that he supports and condones illegal acts by the NYPD.



21.     During that meeting, I also handed him a report again that I previously handed to him on 7/16/17 in Clement Clarke Moore Park in the Chelsea district in Manhattan in front of Mr. Gartland and other whistleblower news censors in journalism. That report contained screenshots from video recordings that summarized illegal acts and omissions that were committed against me partly by members of his NYPD security detail since 4/27/17 at public forums that he conducted. The Mayor lied to my face on 7/16/17 in that park by fraudulently telling me that he supports civil rights and military veterans in response to questions that I then asked him about that to put him on the spot in front of whistleblower news censors in journalism.

22.     The next screenshot corresponds to what appears at the elapsed time of 2 minutes in the 7/18/17 video from the Mayor's resource fair meeting on that date. Jamal Othman appears in it as he stood behind the Mayor and Mr. Banks as he stood next to Defendant Ramos, who appears in the lower-right corner. I talked with Mr. Othman during that meeting as we stood near the Mayor and I found my conversation with Mr. Othman to be useless and made that point perfectly

clear then to the Mayor.



23.     Mr. Othman's profile on the LinkedIn web site includes a photograph of him and reflects

his career. That profile is available on the Internet at https://www.linkedin.com/in/jamal-othman-

650709b/ and confirms that he worked for the Mayor's administration between 7/18/17 and

10/4/17. He thereafter attended a public hearing on 10/2/17 in which I testified in the Committee

Room in City Hall primarily to New York City Councilman Eric Ulrich as that hearing was

conducted by the City Council's Committee on Veterans. That hearing was recorded on video as

a result of arrangements that the City Council made. That video recording is available on the

Internet at https://councilnyc.viebit.com/player.php?hash=iL2CQdQxyO6c. My testimony in the

video recording that was recorded of that hearing as a result of arrangements that the City

Council made begins at the elapsed time of 2 hours, 8 minutes, and 3 seconds. My discussion

with Mr. Ulrich as I testified in that hearing lasted until the elapsed time of 2 hours, 26 minutes,

and 27 seconds in that video. The City Council also arranged to have a written transcript to be prepared as a PDF file of that hearing's testimony. That transcript is available on the Internet from the City Council's web site at

https://legistar.council.nyc.gov/View.ashx?M=F&ID=5494538&GUID=66CD10B5-A046-4010-8BEE-AC61F3816F20. That transcript isn't entirely accurate, but it does accurately confirm that Mr. Othman attended that public hearing. My testimony in that transcript begins on line 24 on page 117 in that transcript that misspelled my last name as "Korematsu". The video recording of my testimony to Mr. Ulrich then confirms that I engaged in protected whistleblowing about matters that included the following:

a.  Illegal acts and omissions that members of the Mayor's NYPD security detail and the Mayor's CAU had been committing against me at the sites of public forums that the Mayor had been conducting with others in relation to efforts that I had taken to lawfully attend them and engage in whistleblowing and criticism partly against the Mayor, Mr. Banks, his administration, the NYPD, and his administration's business partners in accordance with my First Amendment and Fourteenth Amendment rights while doing so.

b.  Wage-theft, fraud, and negligence that HRA and/or its business partners committed against me that was ongoing.

c.  My having been viciously assaulted due to fraud and negligence by HRA and Urban.

d.  The lack of support for hiring military veterans that existed in the Mayor's administration.

e.  The fact that I had been unable to be provided legal assistance after talking with the Mayor, Mr. Banks, and Mr. Ulrich previously about that.

     f.   Whistleblower news censorship in journalism in New York City.

24.     It's conceivable that Mr. Othman and/or others who attended that 10/2/17 public hearing as I testified in it or otherwise watched the video recording of it as I testified in it engaged in acts that ultimately contributed to causing me to be prevented from attending the Mayor's 10/4/17 town hall as well as a public press conference that was conducted in front of the main steps to City Hall on 10/3/17 at 12 pm pm that concerned efforts to reform how the NYPD operated.

25.     The following is a link to the video recording on the Internet that the Mayor's office arranged to be recorded of the Mayor's 7/25/17 publicity stunt publicity stunt that the Mayor illegally conducted next to a staircase on 7/25/17 inside of the MTA subway station located in Manhattan below Broadway near City Hall by Warren Street:

 https://www.youtube.com/watch?v=Hq2Q4tPrN2A

26.     On 7/25/17, Mr. Redmond flagrantly and illegally violated my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment in retaliation for my having lawfully engaged in protected whistleblowing activity in the immediate vicinity of a large group of whistleblower news censors in journalists, the Mayor, members of the Mayor's staff, and members of the public inside of the subway station that I have discussed above.

27.     The next screenshot was created from what is shown at the elapsed time of 10 minutes and 18 seconds in the video that I just discussed.



28.    The preceding screenshot shows Mr. Redmond flagrantly assaulting me behind a metal

partition near the Mayor and Eric Phillips while Mr. Phillips worked a mouthpiece for the

Mayor. Mr. Redmond assaulted me then by illegally grabbing my left arm and dragging me by it

along the subway platform where I had been standing as I was lawfully conducting myself while

engaging in whistleblowing near and against the Mayor, his administration, and its business

partners. I did so then within earshot of many whistleblower news censors in journalism that

quite fittingly were assembled together like rats and snakes. Mr. Redmond's assault against me

then occurred behind the vertical metal partition shown in that screenshot. By deliberately

making physical contact with me and dragging me in that subway station on 7/25/17, Mr.

Redmond violated 18 U.S.C. 245(b)(5), NYPL §240.26, NYPL §240.20, and NYPL §195.00 in

the process of causing irreparable harm to my rights pursuant to the First Amendment, Fourth

Amendment, Fifth Amendment, Fourteenth Amendment, and the MTA's Rules of Conduct to

continue to lawfully engage in protected whistleblowing near the Mayor from where I had been standing on that subway platform. The MTA's Rules clearly prohibited the Mayor from conducting his publicity stunt in that subway station because it was conducted next to a staircase, involved the use of a microphone, and impeded the movements of those in that subway station. Those same MTA Rules authorize public speaking in subway stations however and that is exactly what I was doing when Mr. Redmond illegally seized my left arm and criminally assaulted me by doing so. By doing so then and so publicly, he caused me enormous embarrassment and justifiable rage. Upon leaving that subway station, I received an unexpected telephone call from a civil rights attorney named Norman Siegel. He immediately told me during that call that I had a legal right to scream and shout in that subway station. In response, I told him that I hadn't done so and had instead merely projected my voice with my lungs in that subway station. I did so then to compete against the Mayor's use of a microphone during his illegal publicity stunt and noise from subway trains.

29.     On 10/3/17, I talked face-to-face with Defendants Vance, Jr. and Byrne, Jr. during a meeting that was conducted at the New York City Bar Association that is located at 42 West 44th Street in Manhattan. Information about that meeting is available from the New York City Bar Association's web site at https://www.nycbar.org/media-listing/media/detail/police-officer-testimony-a-quarter-of-a-century-after-the-mollen-commission. That meeting was also attended by an attorney named Ron Kuby and a whistleblower news censor in journalism named Joseph Goldstein. I talked with both of them at the end of that meeting in the room in which it was conducted. While talking with Defendants Vance, Jr. and Byrne, Jr. during that meeting, I specifically and clearly asked both of them to intervene on my behalf to end the NYPD's illegal practice of preventing me from attending public forums that the Mayor was conducting. In

response, Mr. Vance, Jr. told me then that he wouldn't do so and didn't know if such acts against

me violated any laws. When I immediately responded to that by telling him that my exclusion

from such public forums constituted violations of federal criminal statutes, Mr. Vance, Jr.

irrelevantly stated that he wasn't a federal prosecutor instead of agreeing to properly and

promptly do his job partly by acting in compliance with 42 USC §1986, his Fourteenth

Amendment affirmative legal duty as a law-enforcement official to intervene on my behalf to

uphold my constitutional rights upon being apprised that they were being violated, and the

constitutional oath that he took upon becoming an employee of the City of New York. When I

talked with Mr. Byrne, Jr. during that meeting about the fact that members of the NYPD had

been illegally preventing me from attending public forums that the Mayor had been conducting,

he told me that I would have to keep reporting complaints about that instead of similarly

agreeing to uphold his legal duties as a law-enforcement official to properly and promptly

intervene on my behalf to end the illegal acts and omissions that were being committed against

me by members of the NYPD and members of the Mayor's staff that were causing me to be

illegally barred from attending public forums that the Mayor was conducting with others. The

following is a link to the audio recording that the New York City Bar Association arranged to be

recorded of the meeting that was held on 10/3/17 in which my conversation with Mr. Vance, Jr.

can be heard after substantially amplifying that recording due to the low volume level at which it

was recorded because microphones were not functioning properly when members of that

meeting's audience tried using them to ask questions during it:

http://www2.nycbar.org/mp3/Podcasts/media/police-officer-testimony-panel-2017-10-03.mp3

My discussion with Mr. Vance, Jr. during that audio recording extends from the point in that

recording that is roughly 2 hours, 3 minutes, and 50 seconds from its beginning to the point in it

that is 2 hours, 5 minutes, and 11 seconds from its beginning. The next screenshot is from a

video recording that I recorded with my cell phone at 6:23 pm on 10/3/17 while attending that

meeting at the New York City Bar Association. It shows Mr. Byrne, Jr. on the far-left as he sat

next to Alan Dershowitz, who is a prominent attorney.



30.     The Mayor's office and others arranged to have identical public notices issued on the

Internet about the Mayor's 10/4/17 town hall that identified when and where it would be

conducted, how the public could register in advance to attend it, organizations that sponsored

that public forum, and the member of the City Council who would moderate that town hall while

the Mayor, New York City Councilman Ritchie Torres, and other government officials were

running for re-election and using town hall meetings and resource fair meetings that they

conducted as campaign events to attract publicity and goodwill to benefit their re-election

aspirations. A true copy of the public notice that was issued for the Mayor's 10/4/17 town hall

appears within the annexed **Exhibit 1**.

31.     A public notice for the Mayor's 10/4/17 town hall was posted on 10/4/17 at 5:30 pm on

the Twitter account that has the username of "@bronxdems" that is registered to a group known

as the Bronx Democratic Party. That Twitter posting is available on the Internet at

https://twitter.com/bronxdems/status/915690497582043137. That notice includes information

about the following:

    a.   When and the address where that town hall meeting would be conducted.

    b.   The fact that Ritchie Torres of the City Council would act as the moderator of that

public forum.

c.  How members of the public could register in advance to attend that public forum.

d.  The identities of some of the government officials that the Mayor would conduct that town hall with.

e.  The names of various groups that helped to sponsor that town hall.

f.  The times when the entrances for gaining access to that town hall meeting would be opened and closed on 10/4/17.

32.   The following shows the e-mail message that I sent on 10/1/17 at 8:41 pm to the e-mail address that the Mayor's office used to process registrations for the Mayor's 10/4/17 town hall to register in advance to attend that public forum:

> From: towaki_komatsu@yahoo.com
> Subject: Re: RSVP for 10/4/17 public Town Hall meeting with New York City's Mayor
> Date: October 1, 2017 at 8:41:37 AM EDT
> To: bronxtownhall@cityhall.nyc.gov
>
> This is my RSVP for the Mayor's 10/4 public town hall meeting.
>
> Towaki Komatsu

33.   As I have discussed above, prior to sending that e-mail message, members of the Mayor's staff and members of the Mayor's NYPD security detail repeatedly committed illegal acts and omissions with other government personnel that include New York State court officers and other members of the NYPD against me while I was conducting myself in an entirely lawful manner that caused me to be illegally and repeatedly prevented from attending public town hall meetings, public resource fair meetings, and a public hearing from within the rooms in which members of the public conducted them in a collaborative manner with the Mayor and other government officials as they were conducted on 4/27/17, 5/23/17, 6/8/17, 7/12/17, 8/30/17, 9/8/17, 9/14/17, 9/26/17, 9/27/17, and 9/28/17. Those illegal acts and omissions against me were

again committed against me on 10/4/17 in relation to my efforts to have lawfully attend the

Mayor's 10/4/17 town hall from within the room in which it was conducted as it was conducted

by the some of the same criminals who previously committed such illegal acts and omissions

against me at public forums on the dates that I just listed. The illegal acts and omissions that

were perpetrated against me on 10/4/17 in relation to my efforts to lawfully attend the Mayor's

10/4/17 town hall meeting occurred while I continued to engage in protected activities through **a)**

my HRA lawsuit that was ongoing in which I had active claims about having been previously

barred from the Mayor's 4/27/17 town hall and 5/23/17 resource fair and **b)** whistleblowing

about matters of both public and private concern against the Mayor's administration, its business

partners, the NYPD, and other government personnel that I engaged in partly by testifying in

public hearings.

34.     The illegal acts and omissions that were committed against me in relation to my efforts to

lawfully attend public forums that were conducted **a)** on 10/3/17 at 12 pm pm in front of the

main steps of City Hall and b) jointly at a town hall meeting in the Bronx on 10/4/17 by the

Mayor, Mr. Banks, Ritchie Torres, and others that my claims in this complaint concern were in

furtherance of an ongoing campaign of harassment and unequal treatment against me that lacked

a rational basis and were committed against me at public forums. That campaign was comprised

of patently illegal acts that were unofficial practices, customs, and policies that were devised,

executed, condoned, ignored, ratified, illegally covered-up, and coordinated by and among senior

policymakers that include the Mayor and Defendant O'Neill; senior members of the Mayor's

staff that include Defendants Ramos and Carrion; and Defendant Redmond. The following

patently illegal acts against me comprised that campaign and were again illegally executed

against me on 10/3/17 and 10/4/17 at the sites of the public forums that I discussed at the start of

this paragraph in relation to my efforts to have lawfully attended them:

a. Whistleblower retaliation.

b. Voter suppression and voter fraud in violation of the Hatch Act (5 U.S.C. §1502(a)(1)) for the benefit of the Mayor, Mr. Banks, members of the City Council, themselves, and other government personnel while the Mayor, members of the City Council, and other government officials were then running for re-election and using those public forums as campaign events to attract support that includes publicity while illegally marginalizing criticism against the Mayor, his administration, the NYPD, members of the City Council, and other government officials during those public forums partly by illegally denying such critics access to the rooms in which those public forums were conducted as they were conducted.

c. Prior restraints on First Amendment rights.

d. Abuse of process, viewpoint discrimination, standardless discretion, other discrimination that includes illegal segregation.

e. Violations of due process, equal opportunity, and selective-enforcement that corresponds to the class-of-one legal theory and is tied to an illegitimate animus.

f. Failure to intervene on my behalf by members of the NYPD and members of the Mayor's staff to fully comply with and uphold my constitutional rights at the sites of public town hall, public resource fair, and public hearings that the Mayor and other government officials conducted on the dates when they were conducted as well as a publicity stunt that the Mayor illegally conducted in a subway station near City Hall in violation of the MTA's rules as members of the NYPD, Mayor's staff, and other government officials flagrantly committed illegal acts and omissions against me in

their immediate presence as they exhibited a deliberate indifference about that in furtherance of a conspiracy to violate and illegally condone such illegal acts and omissions against me.

g.  Unofficial arrests by a show of authority in violation of the Fourth Amendment of the First Amendment right to lawfully access, assemble, petition for redress, and receive and disseminate information in public forums.

h.  Harassment and reprisals in response to protected activities I engaged in against them and otherwise tried to engage in against them since 4/27/17. On 9/8/17, NYPD Officer Cruz (shield # 751) and someone else I don't know and yet suspect was Defendant Nieves illegally prevented me from attending a public hearing that the Mayor conducted in City Hall at 2 pm in its Blue Room that was partly about proposed legislation for reforming how the NYPD operates. I intended to testify in that hearing against both of them, the Mayor, other members of the Mayor's NYPD security detail, other members of the NYPD, and members of the Mayor's staff.  On 9/8/17, Mr. Cruz was personally involved in having illegally prevented me from walking past him shortly after 1:50 pm to enter City Hall to testify in the public hearing that I just discussed while he was then assigned to the NYPD guardhouse that is located just inside of the entrance to City Hall by Park Row. The NYPD thereafter illegally didn't provide me video recordings from its video security cameras in that area in response to a timely FOIL demand that I submitted for those public records. Instead, the NYPD illegally destroyed that evidence. I sought those video recordings from the NYPD to decisively establish the fact that both Mr. Cruz and I were at that guardhouse as Mr. Cruz illegally prevented me from lawfully attending that public

hearing. Protected activities that I managed to engage in against the Mayor's NYPD security detail and other members of the NYPD on and after 4/27/17 were by reporting entirely valid complaints to the CCRB, DOI, IAB, DOJ, NYAG, City Council, New York City Public Advocate's office, Mayor, Defendant O'Neill, people I later learned were whistleblower news censors in journalism, and in my HRA lawsuit. The following are among the ways that I did so:

i.   I engaged in protected whistleblowing against Defendant Redmond in remarks that I made at the elapsed time of 37 seconds in a video recording that I recorded with my cell phone of the Mayor on 9/26/17 at 12:33 pm in the presence of whistleblower news censors in journalism as the Mayor stood in front of a building in which he resided while he was a student of New York University. . I inadvertently recorded that video upside-down. A properly rotated version of that video is available on the Internet at https://drive.google.com/file/d/1hdNYP3AOw4Oi9RPpzItXsvOINQQvm1R8/view?usp=sharing. That whistleblowing concerned Defendant Redmond's status as the defendant in *Sherrard v. City of New York*, No. 15-cv-7318 (MB) (S.D.N.Y. Jun. 13, 2018). Mr. Redmond blatantly and materially lied as he testified in that case at trial while I attended it and in a deposition that he gave on 5/19/17. The New York City Law Department provided me a copy of that deposition and a video recording that jointly confirm that Defendant Redmond lied during that deposition about why he illegally directed other members of the NYPD to cause the plaintiff in that case to be stopped as he lawfully rode a bicycle on Lafayette Street toward Leonard Street in front of the New York

City Family Court on 9/17/12 as Mr. Redmond lied in that deposition by fraudulently claiming that Mr. Sherrard was then blocking a car that he was driving. The video recording that the New York City Law Department provided to me of that incident clearly confirms that Mr. Redmond lied about that because it shows Mr. Redmond driving in the middle of a street while Mr. Sherrard was lawfully riding a bicycle along the far-left side of that roadway at a distance from the front of Mr. Redmond's car that was more than two car lengths from it as other bicyclists behind Mr. Sherrard whose conduct he didn't control also separated where he then was from where Mr. Redmond's car was.

ii.   I similarly engaged in protected whistleblowing against Defendant Redmond about *Sherrard v. City of New York* and Michael Gartland's status as a censor in journalism in remarks that I made at the elapsed times of **a)** 14 seconds and **b)** 38 seconds in a video recording that I recorded with my cell phone of the Mayor on 9/26/17 at 1:20 pm in the presence of whistleblower news censors in journalism as the Mayor stood near the building in which he resided while he was a student of New York University. A copy of that video is available on the Internet at

https://drive.google.com/file/d/15h47dqh6hRaLhTnidqFGWqR5EIUspEkI/view?usp=sharing. That video recording confirms that I explicitly asked the Mayor at the elapsed time of 4 seconds if I could attend the public town hall meeting that he would conduct on that date without getting a response from him. Ms. Ramos appears in that video at the elapsed time of 31 seconds.

iii. I began asserting claims in my HRA lawsuit against Defendant Redmond, Gerola, and other members of the NYPD on 5/19/17 through an order to show cause application that I filed in that case. That occurred before a senior aide to the Mayor named Jaclyn Rothenberg who worked for him in a capacity that was related to a spokeswoman sent an e-mail message on 6/28/17 at 5:18 pm that confirms that she **a)** illegally had access to information about updates in my HRA lawsuit that was then sealed at my request since January of 2017 and **b)** communicated that information to Defendants Redmond, Ramos, Carrion, and Phillips as well as to other senior members of the Mayor's staff that included Emma Wolfe (the Mayor's Chief of Staff), Andrea Hagelgans, Michael Casca, Kayla Arslanian. The following screenshot shows that e-mail message that I received from the Mayor's office with other records on 2/15/19 in response to a FOIL demand that I submitted to it on 7/1/17 to be provided all records that the Mayor's administration had about me.

> **From:** Rothenberg, Jaclyn
> **Sent:** Wednesday, June 28, 2017 17:18
> **To:** Ramos, Jessica
> **Cc:** Phillips, Eric; Redmond, Howard DI.; Hagelgans, Andrea; Casca, Michael; Arslanian, Kayla; Carrion, Marco A.; Wolfe, Emma
> **Subject:** RE: town halls
>
> Confirmed that he appeared at 4WTC on June 6 and served an Order to Show Cause. That OSC and another pending matter were submitted to the court for a decision on June 7. HRA is still waiting for the written decision.

Ms. Ramos thereafter committed defamation against me in an e-mail message that she sent to Erin Durkin on 6/28/17 at 5:42 pm in which she stated the

following as he lied about both legal filings that were submitted in my HRA

lawsuit and disruptive behavior that I never exhibited in June of 2017 at

HRA's offices located at 150 Greenwich Street in Manhattan while lawfully

serving legal papers upon HRA in conjunction with my HRA lawsuit.

> "Mr. Komatsu has been served an Order to Show Cause due to his
> appearance at HRA in June, when he showed disruptive behavior. That
> OSC and another pending matter were submitted to the court for a
> decision on June 7. HRA is still waiting for the written decision."

Contrary to Ms. Ramos' lies, I was never served an order to show cause

application to which she referred in the following excerpt from that e-mail

message an no such order to show cause application was filed in my HRA

lawsuit by an attorney for HRA. Instead, it was my order to show cause

application that I lawfully served upon HRA and filed in my HRA lawsuit.

Prior to lying about me then, Ms. Ramos lied about me earlier as she stated

the following remarks in an e-mail message that she sent to Ms. Durkin and

Defendant Phillips at 3:27 pm on 6/28/17:

From: Ramos, Jessica
Sent: Wednesday, June 28, 2017 3:27 PM
To: Erin Durkin
Cc: Phillips, Eric
Subject: RE: town halls

Hi Erin,

Mr. Komatsu has never RSVP'd to a town hall. He is allowed to enter the overflow room.

Contrary to Ms. Ramos' lie in the preceding excerpt from that e-mail message,

I RSVP'd in advance for every public town hall and public resource fair

meeting that the Mayor conducted that I attempted to attend and Ms. Durkin

thereafter sent her an e-mail message in which she tactfully pointed out that

she was aware that Ms. Ramos had blatantly lied to her about that. Also, her remark in that e-mail message about me being allowed to "enter the overflow room" for town hall meetings that the Mayor conducted with others is a clear smoking gun that substantiates my claims in this action because it decisively establishes that a premeditated illegal scheme existed among senior members of the Mayor's staff to prospectively subject me to an illegal prior and pre-emptive restraint without any due process on my rights pursuant to the First Amendment, Fifth Amendment, and Fourteenth Amendment to lawfully assemble in the specific rooms in which the Mayor conducted public town hall meetings as they were conducted by illegally preventing me from being in those rooms during those public forums.

iv. I thereafter filed a new order to show cause application in my HRA lawsuit as recently as 9/18/17 in which I requested to be granted relief that would compel the City of New York to enable me to attend whichever town hall, resource fair, and public hearings that the Mayor conducted within the rooms in which they were conducted as they were conducted before James Clynes and New York State Supreme Court Judge Alexander Tisch illegally and willfully delayed that application from being promptly and properly reviewed on the merits while Mr. Clynes was trying to be elected as a New York City Civil Court judge and was Judge Tisch's court attorney. He thereafter literally sat in the front row during the Mayor's 9/26/17 town hall after he was recorded on video on 9/26/17 as he walked right by Mr. Gerola and I to enter the school that hosted that town hall.

v.   I engaged in protected whistleblowing against Raymond Gerola of the
Mayor's NYPD security detail and other members of the Mayor's NYPD
security detail during discussions that I had with a whistleblower news censor
in journalism named Michael Gartland on 5/23/17 inside of the Bronx
Supreme Court while that was recorded on video and 7/16/17 after he and
other whistleblower news censors in journalism witnessed a conversation that
I had with the Mayor in a small park named Clement Clarke Moore Park in
the Chelsea District of Manhattan that another whistleblower news censor in
journalism named Grace Rauh was also then in.

vi.   I engaged in protected whistleblowing against the Mayor's NYPD security
detail and New York State Court officers who illegally prevented me from
attending the Mayor's 4/27/17 town hall and 5/23/17 resource fair on 5/23/17.
I did so by promptly telling Jumaane Williams and Brad Lander during a
meeting that was conducted in lower Manhattan near 200 West Street that I
was illegally prevented from attending the Mayor's 5/23/17 resource fair by
members of the Mayor's NYPD security detail. Back then, Mr. Williams was
a member of the City Council. He is now the New York City Public Advocate
and I have no reason to believe that he took any appropriate action in response
to my complaints against members of the Mayor's NYPD security detail.

vii.   I engaged in protected whistleblowing against the Mayor's NYPD security
detail and New York State Court officers who illegally prevented me from
attending the Mayor's 4/27/17 town hall and 5/23/17 resource fair on 5/24/17
during a meeting that Eric Schneiderman conducted with New York State

Assemblywoman Liz Krueger that was conducted at the CUNY Graduate Center that is located at the intersection of Fifth Avenue and 34th Street in Manhattan. Mr. Schneiderman was then the New York State Attorney General. I did so then by writing questions about that on a comment card I was given during that meeting that I handed back to see if Mr. Schneiderman would address my questions on that card. While serving as the moderator for that meeting, Ms. Krueger didn't ask him anything about what was written on the comments card that I submitted. Prior to submitting that comments card, I recorded the questions that I wrote on that card in a Microsoft Word file largely because I presciently anticipated that either Mr. Schneiderman would prove to be too spineless to answer my questions during that meeting or Ms. Krueger would be too spineless to ask them during it.

viii. I reported entirely valid complaints to the DOJ on 6/5/17 against Mr. Redmond, Mr. Gerola, Mr. Nieves, and other members of the NYPD before I received letter dated 8/28/17 from Lara Eshkenazi in her capacity as the co-chief of the DOJ's civil rights unit for the U.S. Attorney's Office for the Southern District of New York in which she lied by claiming that the complaints that I reported to the DOJ didn't appear to implicate a violation of federal civil rights laws over which her office had jurisdiction. Contrary to that lie, her office had jurisdiction over aspects of my complaints that corresponded to violations of 42 USC §242, 42 USC §1985 and 42 USC §1986. This is further confirmed by 34 U.S.C. §12601. Also, the criminal division of the U.S. Attorney's Office for the Southern District of New York

had jurisdiction over aspects of my complaints that corresponded to violations of 18 USC §245(b)(5), 18 USC §241, and other applicable laws. I thereafter reported new and entirely valid complaints to the DOJ on 9/1/17 against Defendants Redmond, Nieves, and other members of the NYPD after they illegally caused me to be ejected from the Mayor's 8/30/17 town hall.

ix. I engaged in protected whistleblowing against Mr. Gerola and members of the Mayor's staff on 6/8/17 as I talked with New York State Assemblyman Andrew Hevesi directly in front of the building that hosted the town hall meeting that the Mayor conducted on that date in Rego Park in Queens before that town hall began and shortly after it ended. A whistleblower news censor in journalism named Jon Cronin witnessed my conversation with Mr. Hevesi after that town hall ended.

x. I testified against Mr. Gerola and other members of the Mayor's NYPD security detail on 6/14/17 during the public hearing that the City Council's Committee on Public Safety conducted that was recorded on video and transcribed in writing.

xi. I engaged in protected whistleblowing against Defendant Redmond and other members of the Mayor's NYPD security detail during conversations that I had with whistleblower news censors in journalism named Marcia Kramer and Juliet Papa on 6/15/17 during a town hall meeting that CBS New York conducted in Corona in Queens that another whistleblower news censor in journalism named Erin Durkin attended while that town hall was recorded on video.

xii.   I engaged in protected whistleblowing against Mr. Redmond, Mr. Gerola, and Mr. Nieves in communications that I had with a whistleblower news censor in journalism named Graham Rayman between 6/28/17 and 7/4/17 that were largely by e-mail.

xiii.   I reported entirely valid complaints to the CCRB against Mr. Redmond, Mr. Gerola, Mr. Nieves, and other members of the NYPD on 4/27/17, 6/1/17, 6/9/17, 6/24/17, 9/1/17, 9/13/17, 9/15/17, and 9/27/17.

xiv.   I reported entirely valid complaints to DOI and IAB on 5/25/17 against Mr. Redmond, Mr. Gerola, Mr. Nieves, and other members of the NYPD.

xv.   I engaged in protected whistleblowing on 6/6/17 against the Mayor's NYPD security detail in an e-mail message that I sent to former New York City Councilwoman Melissa Mark-Viverito who moderated the Mayor's 9/28/17 town hall, Lourdes Rosado while she headed the NYAG's civil rights division, and the New York City Public Advocate's office.

xvi.   I engaged in protected whistleblowing on 9/1/17 against the Mayor's NYPD security detail in e-mail messages that I sent to Brooklyn District Attorney Eric Gonzalez and Jumanne Williams that concerned my having been illegally ejected from the Mayor's 8/30/17 town hall.

xvii.   I engaged in protected whistleblowing on 9/1/17 and 9/9/17 against the Mayor's NYPD security detail in e-mail messages that I sent to Lourdes Rosado.

35.   Prior to 10/3/17, Defendants Mason was personally involved in illegally preventing me from attending the Mayor's 9/14/17, 9/26/17, and 9/28/17 town hall meetings from within the

rooms in which they were conducted while I was conducting myself in an entirely lawful manner in contrast to him and other members of the NYPD and Mayor's staff who were near us on those dates at the sites of those public forums.

36.     Prior to 10/3/17, Defendant Hansen was personally involved with other members of the NYPD in illegally preventing me from attending the Mayor's 8/30/17 town hall meeting in Brooklyn while I was conducting myself in an entirely lawful manner in contrast to him and other members of the NYPD and Mayor's staff who were near me on that date at the site of that public forum.

37.     Prior to 10/3/17, Defendants Baez and Dean were personally involved with other members of the NYPD in illegally preventing me from attending the Mayor's 9/27/17 public resource fair meeting in Manhattan while I was conducting myself in an entirely lawful manner in contrast to them and other members of the NYPD who were near us then at the site of that public forum.

38.     On 10/2/17, I was permitted to attend a publicity stunt that Letitia James conducted at 10 am in front of the main steps that lead to City Hall. The next screenshot is from a video recording that I recorded of Ms. James at 10:08 am as she then engaged in grandstanding then and there while the front of City Hall's building appeared in the background. Just one day later, Defendants Mason, Baez, and Hansen all illegally, arbitrarily, and capriciously prevented me from standing where I stood as I recorded that video on 10/2/17.



39.     Prior to arriving to the site of the Mayor's 10/4/17 public town hall meeting on that date,

I presciently anticipated that members of the Mayor's CAU and NYPD would illegally violate

my right pursuant to the First Amendment and Fourteenth Amendment to attend that public

forum. That prompted me to call the office of Ritchie Torres on 10/4/17 to try to get a firm

commitment from his staff that they would make certain that I would be granted my

constitutional rights to attend that public forum. I called Mr. Torres' staff then because he would

be the moderator for that public forum. However, Mr. Torres' staff refused to intervene on my

behalf in this way in spite of the fact that Mr. Torres is a New York City lawmaker who has

introduced legislation concerning police reforms.

40.     The Mayor' office arranged to have the Mayor's 10/4/17 town hall recorded on video.

That video recording is available on the Internet at https://www.youtube.com/watch?v=-HYISzvYwZo. The next screenshot is from the elapsed time of 13 minutes and 50 seconds in that video as I played it back with the closed-captioning feature enabled. It confirms that the Mayor then made remarks to that town hall's audience in which he told them that senior members of his administration who were in attendance at that town hall would continue to be there all night to be available to talk with the audience members about whatever was on their mind. Remarks that he then made to that effect sufficient confirm that town hall was subject to New York State's Open Meetings Law because a quorum comprised of senior government officials was then present there and conducting public business.



**LEGAL STANDARDS AND ADDITIONAL BACKGROUND FACTS**

1.      I incorporate by reference the statements that I made in all of the preceding paragraphs as though fully set forth herein.

2.      The following excerpts from _Brown v. Board of Regents of University of Nebraska_, 640 F. Supp. 674 (D. Neb. 1986) and _Nichols v. Hager_, No. 3: 04-CV-0559-LRH-LRL (D. Nev. Aug.

1, 2012) confirm that I had a First Amendment right to have attended the **a)** 10/3/17 public forum at 12 pm pm in front of the steps of City Hall about reforming the NYPD and **b)** the Mayor's 10/4/17 town hall:

> **_Brown v. Board of Regents of University of Nebraska_**:
>
> "The First Amendment not only safeguards free speech and press, but public places for purposes of expressive activity. A constitutional right of access to a public forum is guaranteed to all."
>
> **_Nichols v. Hager_, No. 3: 04-CV-0559-LRH-LRL (D. Nev. Aug. 1, 2012)**:
>
> "Nichols has thus shown sufficient evidence that her constitutional right to attend a public meeting was violated."

3.      The U.S. Supreme Court's decision in _Houchins v. KQED, Inc._, 438 U.S. 1, 98 S. Ct. 2588, 57 L. Ed. 2d 553 (1978) properly stepped back from a fallacy it expressed in _Cox Broadcasting Corp. v. Cohn_, 420 U.S. 469, 95 S. Ct. 1029, 43 L. Ed. 2d 328 (1975) about the press as it explicitly confirmed in _Houchins v. KQED, Inc._ that "the Constitution provides the press with no greater right of access to information than that possessed by the public at large".

4.      By contrast, the U.S. Supreme Court erred by presumptuously and baselessly claiming that the press is a surrogate of the public in _Cox Broadcasting Corp. v. Cohn_ that hindsight proves is a preposterous contention. The following excerpt from _Cox Broadcasting Corp. v. Cohn_ reflects that preposterous claim:

> "In the first place, in a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations. Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally. With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice. See _Sheppard_ v. _Maxwell,_ 384 U. S. 333, 350 (1966)."

5.      The Mayor's 10/4/17 town hall and was conducted in violation of DOE regulations that

are discussed in *Bloomberg v. The New York City Department of Education*, No. 17 Civ. 3136

(PGG) (S.D.N.Y. Sept. 24, 2019). That town hall was conducted inside of a school named IS 254

that is controlled by the DOE. In order for that town hall meeting to lawfully have been able to

be conducted in that school, invitations would have needed to have been issued to the political

rivals of the Mayor and Ritchie Torres who sought to replace them through the 2017 New York

City government elections. No valid reason exists to believe that prerequisite was entirely met.

The following is a relevant excerpt from that court decision:

> Regulation D-130 (the "Regulation") "governs the use of school buildings by candidates,
> elected officials, and political organizations and the conduct of school employees and
> officers with respect to political campaigns and elections." (Regulation D-130 (Abstract)
> (Dkt. No. 79-3)) The Regulation's introduction provides:
>
> School buildings are not public forums for purposes of community or political
> expression. The following sets forth the rules which govern: (1) the use of, or access to,
> Department of Education school buildings by elected officials, candidates for elective
> office, or organizations working on behalf of such officials or candidates, both during
> school and non-school hours; (2) use of school facilities, equipment and supplies for
> political purposes by school employees, personnel, or staff members and officials; and (3)
> conduct of school employees, personnel, or staff members and officials with respect to
> political campaigns and elections.
>
> (Id. (Introduction) (footnote omitted)).
>
> Section I.B of the Regulation addresses the use of school facilities, equipment, and
> supplies, and provides that — generally — these resources "may not be used on behalf of
> any candidate, candidates, slate of candidates, or political organization/committee." (Id.
> at § I(B)) In particular,
>
> 1. The use of any Department of Education school during school/business hours by any
> person, group, organization, committee, etc., on behalf of, or for the benefit of any
> elected official, candidate, candidates, slate of candidates or political
> organization/committee is prohibited.
> 2. No rallies, forums, programs, etc., on behalf of, or for the benefit of any elected
> official, particular candidate, candidates, slate of candidates or political
> organization/committee may be held in a school building.
> 3. No material supporting any candidate, candidates, slate of candidates or political

| organization/committee may be distributed, posted, or displayed in any school building....

6.       On 11/25/14, a news organization named Gothamist published a news article that is

entitled, "De Blasio Wrongfully Barred Press From Event At Public School" that was written by

Christopher Robbins and is available on the Internet at https://gothamist.com/news/de-blasio-

wrongfully-barred-press-from-event-at-public-school. That article reported that members of the

Mayor's staff illegally prevented members of the press from attending a meeting that the Mayor

conducted in a public school in flagrant violation of the First Amendment. DOI investigated that

incident and issued a report on 11/25/14 in which it confirmed that the Mayor's office

wrongfully barred members of the press from that meeting. That report by DOI is available on

the Internet at https://www1.nyc.gov/assets/doi/reports/pdf/2014/2014-11-25-Pr29cwareport.pdf.

Hindsight confirms that the following remarks that were made about that and are attributable to

the Mayor and a spokesman for him named Wiley Norvell that are reported in that article were

blatant lies as both the Mayor and Mr. Norell fraudulently claimed then that the Mayor's

administration wouldn't again illegally prevent people from attending public meetings that the

Mayor conducted inside of public buildings in New York City:

    a.   Remarks by the Mayor:

         "It was a mistake. I think by definition we were in a public building. The media
         should have been allowed...That was a mistake by my team and a mistake we
         won't make again."

    b.   Remarks by Wiley Norvell:

         "We've reviewed the report's findings and will improve our internal procedures
         to ensure the inadvertent mistake is not repeated."

7.       On 9/8/17, the Mayor's office issued a press release on the Internet that is entitled,

"Mayor de Blasio Signs 12 Bills Strengthening Justice and Equity in New York City" and is

available on the Internet at https://www1.nyc.gov/office-of-the-mayor/news/581-17/mayor-de-blasio-signs-12-bills-strengthening-justice-equity-new-york-city in relation to the public hearing that the Mayor conducted at 2 pm in the Blue Room in City Hall that NYPD Officer Cruz (shield #: 751) illegally prevented me from attending and testifying in with at least one other person in flagrant violation of my constitutional rights and other applicable laws. The following blatant lies and fraudulent misrepresentations that Mr. Banks expressed about the Mayor's administration's commitment to Fourteenth Amendment equal protection rights appear in that press release:

    a.  "Diversity and inclusion are the foundation of our City"

    b.  "We applaud this Administration's commitment to these core values and for making a concerted effort to ensure that all New Yorkers, regardless of race, gender, and sexual orientation have equal access to services and resources".

8.      To honor Ruth Bader Ginsburg's legacy in the wake of her having recently passed away, I'll next discuss remarks that she and former fellow U.S. Supreme Court Justice Antonin Scalia made on 4/17/14 about what the First Amendment stands for as both of them were being interviewed by a journalist. Their remarks during that interview are shown and heard in a video recording on C-Span's web site in a report that is entitled, "Justices Scalia and Ginsburg on the First Amendment and Freedom". That report and video recording is available on the Internet at https://www.c-span.org/video/?318884-1/conversation-justices-scalia-ginsburg-2014. At the elapsed time of 9 minutes and 57 seconds in that video, Justice Ginsburg made the following remarks about the First Amendment:

"This says, "Congress shall make no law abridging the freedom of speech or of the press" so it's…it's directed to government and it says, "Government, hands off. These rights already exist and you must not touch them.""

9.      The next screenshot is from that video and shows Justice Ginsburg as she made the preceding remarks:



10.     At the elapsed time of 19 minutes and 6 seconds in that video, Justice Scalia made the

following remarks about the First Amendment:

> "I think if you had to pick…and you probably shouldn't have to….but if you had to pick
> one freedom that was…that is the most essential to the, uh…functioning of a democracy,
> it has to be freedom of speech because democracy means persuading one another and
> uh…and then ultimately voting and the majority…the majority rules. You can't run such
> a system if uh…if if …there is uh…muzzling of uh…one point of view. So, it's a
> fundamental freedom in a democracy…much more necessary in a democracy than in any
> other system of government. I guess you could run an effective monarchy without
> freedom of speech. I don't think you could run an effective democracy without it."

11.     The next screenshot is from that video and shows Justice Scalia as he made the preceding

remarks:



12.     The discussion that follows addresses critically significant remarks that former Second

Circuit Judge Christopher Droney stated on 3/26/19 during the oral arguments hearing that was

conducted in _Knight First Amendment Inst. Columbia v. Trump_, 928 F.3d 226 (2d Cir. 2019) as

he was recorded on video while making them. Although the findings that were expressed in the

written decisions that were issued in _Knight First Amendment Inst. Columbia v. Trump_, 928 F.3d

226 (2d Cir. 2019) and _Knight First Amendment Institute v. Trump_, 302 F. Supp. 3d 541

(S.D.N.Y. 2018) focused on public forums that exist through the use of Twitter, much of what

was discussed during the oral arguments hearings in those cases addressed public forums that are

conducted in the physical world that include town hall meetings that are conducted inside of

schools. In fact, _Knight First Amendment Inst. Columbia v. Trump_, 928 F.3d 226 (2d Cir. 2020)

confirmed that people have and have had a legal right to attend public forums that occur in the

real world apart from Twitter and other social media platforms. The following are a pair of

relevant excerpts from that decision:

   a.   "A simple analogy to physical public fora makes it clear that the distinction between a tweet and its interactive space is appropriate: **at a town hall meeting held by public officials, statements made by the officials are protected government speech. If, however, public comment is allowed at the gathering—as it is on any tweet posted to the Account—the officials may not preclude persons from participating in the debate based on their viewpoints**. Significantly, that discrimination is impermissible even when the public forum is limited and is "of [the State's] own creation." *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 829 (1995); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) ("The Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place")."

                           (boldface formatting added for emphasis)

   b.   "Excluding people from an otherwise public forum such as this by blocking those who express views critical of a public official is, we concluded, unconstitutional viewpoint discrimination."

13.    The Second Circuit's decision in *Knight First Amendment Inst. Columbia v. Trump*, 928 F.3d 226 (2d Cir. 2020) was based upon the earlier decision that it issued in it as well as the decision that U.S. District Judge Norma Reice Buchwald issued in it at the district court level. The term "town hall" appears no less than **11 times** in the written transcript that was prepared from the oral hearing that Judge Buchwald conducted on 3/8/18 in *Knight First Amendment Institute v. Trump*, 302 F. Supp. 3d 541 (S.D.N.Y. 2018) before she issued her 5/23/18 decision in that case.

14.    The discussion that follows addresses the oral arguments hearing that the Second Circuit conducted on 3/26/19 in *Knight First Amendment Inst. Columbia v. Trump*, 928 F.3d 226 (2d Cir. 2019) as C-Span recorded that hearing on video. That video recording has accurate closed-captioning available for its playback and is available on the Internet at https://www.c-span.org/video/?459092-1/circuit-hears-oral-argument-presidents-twitter-account-case. The following remark that former Second Circuit Judge Christopher Droney made about First Amendment rights in public forums that exist in such places as streets, sidewalks, and parks

instead of the Internet during that oral arguments hearing was recorded at the elapsed time of 13

minutes and 2 seconds in that video:

> "For the First Amendment, it doesn't really have to be much more burdensome. If it's
> more burdensome at all, if you have to move down the street, that violates the First
> Amendment."

15.     What follows are 4 screenshots from that video as I played it back with closed-captioning

turned on that show Judge Droney as he made the remarks that correspond to the preceding

excerpt and is otherwise heard making them as the video camera that recorded that hearing

turned away from him as he made those remarks. Those screenshots and Judge Droney's

statements during that hearing that apply to them, the First Amendment, public forums, and

being coerced to move down the street in regards to efforts that are taken to lawfully attend

public forums from within the rooms in which they are conducted as they are conducted confirm

that defendants in this action illegally prevented me from attending the **a)** 10/3/17 public forum

at 12 pm pm in front of the steps of City Hall about reforming the NYPD and **b)** the Mayor's

10/4/17 town hall as they subjected me to illegal segregation and discrimination in violation of

my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth

Amendment, New York State's Open Meetings Law, and other applicable laws. I recall having

arrived to the site of the Mayor's 10/4/17 town hall sufficiently early. That fact led me to having

been in a position in the line of people that formed outside of and next to the building that hosted

that town hall that should have otherwise caused me to have been granted access to the room in

which that town hall was conducted by virtue of the fact that I lawfully waited in line to be

granted access to it on a first-come, first-serve orderly basis instead of the patently illegal,

discriminatory, arbitrary, and **<u>cherry-picking</u>** manner that members of the Mayor's NYPD

security detail and Mayor's staff followed that flagrantly violated my First Amendment and

Fourteenth Amendment rights as well as other applicable laws.









16.    _Kittay v. Giuliani_, 112 F. Supp. 2d 342 (S.D.N.Y. 2000) explicitly states "that individuals

have a right to communicate directly to government officials". Acts and omissions that are

committed by government personnel that prevent people from attending public forums by being

in the same room as government officials with whom they then seek to exercise their rights

pursuant to the First Amendment and Fourteenth Amendment to "communicate directly to

government officials" directly violates this finding from _Kittay v. Giuliani_ because such illegal

prior restraints on First Amendment rights of peaceable assembly, expressive association, speech

and other forms of expression, petitioning for redress, and receiving information illegally block

direct communication with government officials by those who are barred from such rooms.

17.    *Citizens United v. Schneiderman*, 203 F. Supp. 3d 397 (S.D.N.Y. 2016) addressed illegal

prior restraints on First Amendment rights as follows:

> "A prior restraint on speech violates the First Amendment if it places "unbridled discretion in the hands of a government official or agency." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)."

18.    The following are a pair of excerpts from *Elrod v Burns,* 427 US 347 (1976) about First

Amendment rights that include the right to lawfully assemble in a public forum that

include town hall meetings, public resource fair meetings, and public hearings:

>    a.    "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

>    b.    "The timeliness of political speech is particularly important. See *Carroll v. Princess Anne*, 393 U. S. 175, 182 (1968); Wood v. Georgia, 370 U. S. 375, 391-392 (1962)."

19.    The following excerpt from *Hartman v. Moore*, 547 U.S. 250, 126 S. Ct. 1695, 164 L.

Ed. 2d 441 (2006) confirms that government personnel are prohibited from subjecting people to

reprisals in response to protected conduct:

> "Official reprisal for protected speech "offends the Constitution [because] it threatens to inhibit exercise of the protected right," *Crawford-El v. Britton,* 523 U. S. 574, 588, n. 10 (1998), and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out, *id.,* at 592; see also *Perry* v. *Sindermann,* 408 U. S. 593, 597 (1972) (noting that the government may not punish a person or deprive him of a benefit on the basis of his "constitutionally protected speech"). Some official actions adverse to such a speaker might well be unexceptionable if taken on other grounds, but when nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, we have held that retaliation is subject to recovery as the but-for cause of official action offending the Constitution. See *Crawford-El, supra,* at 593; *Mt. Healthy City Bd. of Ed.* v. *Doyle,* 429 U. S. 274, 283-284 (1977)"

20.    The excerpt shown next from *Dorsett v. County of Nassau*, 732 F.3d 157 (2d Cir. 2013)

makes clear that a violation of a person's right to freedom of expression isn't the only ground

upon which someone can establish that his or her First Amendment rights have been violated. It instead confirms that there are other ways that a person's First Amendment right may be violated. Such ways include and aren't limited to subjecting a member of the public who seeks to attend public town hall and public resource fair meetings within the rooms in which they're conducted as they're conducted by members of the public in a collaborative manner with the Mayor and other government officials to patently unequal and illegal discriminatory treatment in violation of the Fourteenth Amendment without any rational basis and legitimate government justification at the entrance to buildings that host such public forums by applying "additional scrutiny" that oppressively and pre-emptively prevents and otherwise unreasonably impedes and delays the person's First Amendment and Fourteenth Amendment right of access to a public forum.

> "As we have recognized, there is some tension in our First Amendment standing cases. _Gill v. Pidlypchak,_ 389 F.3d 379, 381 (2d Cir.2004). We have sometimes given the impression that silencing of the plaintiff's speech is the only injury sufficient to give a First Amendment plaintiff standing. For example, in _Curley v. Village of Suffern,_ a case relied upon by the district court, we wrote that "To prevail on this free speech claim, plaintiff must prove... [that] defendants' actions effectively chilled the exercise of his First Amendment right." 268 F.3d at 73; _see also Colombo v. O'Connell,_ 310 F.3d 115, 117 (2d Cir.2002); _Spear v. Town of W. Hartford,_ 954 F.2d 63, 67 (2d Cir.1992). This was an imprecise statement of law.
>
> **Chilled speech is not the _sine qua non_ of a First Amendment claim. A plaintiff has standing if he can show _either_ that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm. Various non-speech related harms are sufficient to give a plaintiff standing.** _Zherka v. Amicone,_ 634 F.3d 642, 646 (2d Cir. 2011) (lost government contract); _Tabbaa v. Chertoff,_ 509 F.3d 89, 102 (2d Cir.2007) (**additional scrutiny at border crossing**); _Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,_ 282 F.3d 83, 90 (2d Cir.2002) (revoking a building permit); _Gagliardi v. Vill. of Pawling,_ 18 F.3d 188, 195 (2d Cir.1994) (refusal to enforce zoning laws)."
>
> (boldface formatting added for emphasis)

21.     Findings in _Piesco v. City of New York, Dept. of Personnel,_ 933 F.2d 1149 (2d Cir. 1991)

and _Hampton Bays Connections, Inc. v. Duffy_, 127 F. Supp. 2d 364 (E.D.N.Y. 2001) explicitly confirm that all of the activities listed next are constitutionally protected activities. I was engaged in all of those types of activities on and immediately leading up to the **a)** 10/3/17 public forum at 12 pm pm in front of the steps of City Hall about reforming the NYPD and **b)** the Mayor's 10/4/17 town hall against the Mayor's administration, the Mayor's NYPD security detail, other members of the NYPD, HRA, Mr. Banks, HRA's business partners that included NTT, and Urban, and others that included a judge in my HRA lawsuit and judges that the Mayor appointed. Among the ways that I engaged in such activities were through what was my ongoing HRA lawsuit that was a hybrid proceeding that was comprised of article 78 claims and plenary claims, by distributing whistleblowing literature about matters of public concern in front of and within the buildings in which the Mayor conducted town hall meetings as they were conducted and shortly before they began, and by trying to testify on 9/8/17 against the NYPD, the Mayor, and others during a public forum that the Mayor conducted in City Hall that I was illegally prevented from attending by a member of the NYPD that I discussed earlier.

**Constitutionally protected activities**:

a.   Commencing Article 78 proceedings and attending public meetings and hearings.

b.   Circulating a petition.

c.   Testifying to a government body while engaging in a free discussion of governmental affairs that was partly about the manner in which government should be operated instead of how it was being operated.

d.   Appealing a decision by a city agency.

e.   Petitioning for government reforms.

f.   Appealing the denial of public assistance benefits.

22.     Immediately leading up to 10/3/17, I actively participated in all of the preceding types of protected conduct and otherwise tried to do so as I was illegally prevented from doing so **a)** on 10/3/17 at the public forum at 12 pm pm in front of the steps of City Hall about reforming the NYPD and **b)** while attending the Mayor's 10/4/17 town hall.

23.     Prior to trying to attend the **a)** 10/3/17 public forum at 12 pm pm in front of the steps of City Hall about reforming the NYPD and **b)** the Mayor's 10/4/17 town hall Mayor's 9/26/17 town hall, I was actively involved in litigation activity against the City of New York and the defendants. On 9/5/17, New York State Supreme Court Judge Alexander Tisch issued an order in my HRA lawsuit in which he flagrantly violated my First Amendment and Fourteenth Amendment rights to then be able to effectively petition for redress, have access to the courts, and be accorded proper due process by him in a manner would be in full accordance with *Goldberg v. Kelly*, 397 U.S. 254, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970) clearly expressed is required of due process. *Goldberg v. Kelly* requires due process to be granted at a meaningful time in a meaningful way that is tailored to an individual's circumstances and capacity to be heard. The order that Judge Tisch issued on 9/5/17 in my HRA lawsuit was in response to an order to show cause application that I submitted in that case while New York State Supreme Court Judge Nancy Bannon was on vacation and could not hear that application then for that reason. He also issued that order while Judge Bannon was then running for re-election as a judge and after she behaved in the following ways while she was assigned to my HRA lawsuit:

a.     She illegally granted an illegal ex-parte adjournment application that an attorney for HRA named Jeffrey Mosczyc caused to be faxed to her chambers on 4/5/17 in which he asked her to adjourn the oral arguments hearing that she set on 1/26/17 to be conducted on 4/12/17 in my HRA lawsuit. She illegally granted that in spite

of the fact that I was never given any notice of that application before she illegally granted it. I certainly had a First Amendment and Fourteenth Amendment right to have submitted opposition in response to that illegal ex-parte adjournment application and to have my opposition fully and properly considered by her prior to her making a decision about Mr. Mosczyc's illegal ex-parte adjournment application. Instead, Judge Bannon's court clerk left me a voicemail message at 9:56 am on 4/11/17 in which he apprised me of the fact that Judge Bannon illegally granted Mr. Mosczyc's illegal 4/5/17 ex-parte adjournment application. I instantly knew that Mr. Mosczyc had engaged in illegal gamesmanship by submitting his illegal 4/5/17 adjournment application in an ex-parte manner that is explicitly prohibited by the New York State Court System's regulations, Judge Bannon's written rules of practice, and my First Amendment and Fourteenth Amendment rights. I immediately knew all of that largely because my HRA lawsuit was then parallel litigation with respect to related litigation that I was engaged in against HRA about identical claims that was assigned to OTDA. On 4/11/17, OTDA conducted a fair hearing between HRA and I by telephone that both OTDA and I recorded on audio. My audio recording of that hearing was among the exhibits that I stored on the USB thumb drive that I submitted in my HRA lawsuit in conjunction with my 5/19/17 order to show cause application. The sum and substance of what is heard in that audio recording confirms that Judge Bannon in her 8/10/17 decision by claiming that I hadn't exhausted my administrative remedies for claims that I asserted against HRA as she then referred to OTDA as the New York State administrative appellate forum for

claims asserted against HRA. An attorney for HRA named Marin Gerber both lied

about material matters during that 4/11/17 OTDA fair hearing and flagrantly

violated res judicata for matters that were already decided in my favor against

HRA in relation to the fair hearing decision that OTDA issued in my favor against

HRA on 9/15/16 that OTDA illegally thereafter refused to fully enforce and HRA

refused to fully comply with. Also, the OTDA administrative law judge who

presided over my 4/11/17 fair hearing with HRA confirmed that she wouldn't

allow that hearing to address additional claims that I asserted against HRA that

Jackie Donovan of OTDA's compliance division had added to the agenda for that

4/11/17 fair hearing. I'm referring to additional claims that I apprised OTDA

about in a 62-page fax that I faxed to OTDA on 2/9/17 in order for it to perform

its legal duty to have fair hearings conducted within 30 days thereafter to address

those claims against HRA. OTDA instead illegally never conducted a fair hearing

about those additional claims and continued to illegally bar me from its offices

located at 14 Boerum Place in Brooklyn where it conducts fair hearings in

flagrant violation of my constitutional rights while never granting me any due

process to allow me to challenge the lack of validity for that ban and

discrimination. OTDA has been illegally barring me from that office ever since an

OTDA administrative law judge illegally terminated a fair hearing that I

participated in at that office on 7/5/16 while OTDA recorded it on audio. That

audio recording confirms that administrative law judge illegally terminated that

fair hearing while I was in the middle of trying to lawfully answer a question that

I was asked during it.

b.      She illegally ignored material and admissible evidence that I submitted in that

case on 5/19/17 in conjunction with an order to show cause application. That

evidence was stored on a USB thumb drive and mostly consisted of relevant audio

and video recordings.

c.      She ignored an application that I made in my 5/19/17 order to show cause

application to have my HRA lawsuit unsealed, the City of New York ordered to

enable me to attend public meetings that the Mayor and Mr. Banks would

thereafter continue to conduct, and the City of New York ordered to preserve

video recording evidence that was recorded on 4/27/17 at the site of the Mayor's

4/27/17 town hall at which I was illegally prevented from attending the Mayor's

4/27/17 town hall. My HRA lawsuit was sealed in January of 2017 at my request

and I sought for it to be unsealed on 5/19/17 largely to be able to be able to better

publicize Judge Bannon's misconduct in my HRA lawsuit and the illegal acts and

omissions that members of the Mayor's NYPD security detail, other members of

the NYPD, and members of the Mayor's staff had been committing against me

since the Mayor's 4/27/17 town hall. In short, I sought to lawfully use the sum

and substance of my HRA lawsuit as a weapon to engage in large-scale character

assassinations to ruin the re-election hopes of the Mayor, Judge Bannon, members

of the City Council, and other government officials in 2017 largely by engaging in

word-of-mouth advertising about its entirety while attending public forums that

members of the public conducted in a collaborative manner with the Mayor, Mr.

Banks, other government officials, and journalists in the rooms in which they

were conducted as they were conducted, shortly before they began, and shortly

after they ended while they were recorded on video that was broadcast over the Internet.

d.    She lied in the decision that she issued on 8/10/17 in that case. In that decision, she lied partly by suggesting that I had claimed that HRA stole wages of mine in spite of the fact that I never claimed that and I never worked for HRA. She also severed claims that I asserted in that case from her jurisdiction through that decision that caused those matters to be reassigned to Judge Tisch, who then arbitrarily, capriciously, and illegally refused to begin dealing with those severed and transferred claims until after 9/1/18 in flagrant violation of my First Amendment and Fourteenth Amendment rights. Judge Tisch instead illegally referred those transferred back to Judge Bannon through his 9/5/17 order while essentially treating them like the Coronavirus and a hot potato that he wanted to have absolutely nothing to do with.

e.    She **a)** lied in her 1/31/18 decision in my HRA lawsuit by fraudulently claiming that there wasn't anything that she overlooked and misapprehended in issuing her 8/10/17 decision and **b)** illegally disposed of my HRA lawsuit in its entirety in spite of the fact that I continued to have claims that were pending to be addressed in it by virtue of the fact that she previously severed them from her jurisdiction in her 8/10/17 decision. Judge Tisch thereafter illegally waited until 9/17/18 to issue an order that reinstated my HRA lawsuit. He thereafter illegally did nothing to adjudicate my claims in my HRA lawsuit that Judge Bannon caused to be assigned to him.

24.    The next screenshot is from the last page of Judge Bannon's 8/10/17 decision in my HRA

lawsuit. The remarks that she expressed in it refer to my having been illegally prevented from

attending the Mayor's 4/27/17 town hall and the Mayor's 5/23/17 resource fair meeting partly by

Defendants Nieves, Gerola, and Atcheson while I was conducting myself lawfully.

```
unlawfully precluded the petitioner/plaintiff from attending
certain public meetings, and seek both damages and injunctive
relief, are severed, and the matter is referred to the Trial
Support Office for reassignment to a City Part of this court.

        This constitutes the Decision, Order, and Judgment of the
Court.



Dated: August 10, 2017        ENTER:  _____
                                              J.S.C.
                                      HON. NANCY M. BANNON


                                      _____
                                      C l e r k
```

25.     The following excerpt from *Reno v. American Civil Liberties Union*, 521 U.S. 844, 117

S. Ct. 2329, 138 L. Ed. 2d 874 (1997) relates to how protected speech of public concern that I

engaged in and sought to continue to engage in against the Mayor, Mr. Banks, HRA, HRA's

business partners that include Urban and NTT, the Mayor's NYPD security detail, other

members of the NYPD, other government personnel, whistleblower news censors in journalism,

OTDA, Judge Bannon and other judges, New York State court officers could be amplified by

having me attend public forums that the Mayor and other government officials conducted on and

after 3/15/17 while they were recorded on video that was broadcast over the Internet, attended by

members of the public who took photographs and recorded video recordings while doing so and

otherwise reported about what was discussed during them, and attended by members of the press

who reported about matters that were discussed during them:

> "Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer. As the District Court found, "the content on the Internet is as diverse as human thought." 929 F. Supp., at 842 (finding 74). We agree with its conclusion that our cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium."

26.    If garbage in New York City's fake news industry that included the following people and

many more in 2017 had opted to responsibly stop wrongfully subjecting me to whistleblower

news censorship as they instead served as dutiful and subservient accomplices of the Mayor's

administration and the NYPD to rig the outcomes of the 2017 New York City government

elections for the benefit of the Mayor's administration, City Council, other government officials,

and NYPD by engaging in behavior that is tantamount to voter suppression, voter fraud,

viewpoint discrimination, and whistleblower retaliation, then I wouldn't have needed to try to

attend public forums that the Mayor and other government officials conducted in 2017 after

3/15/17 as much to try to overcome and equitably expose their censorship that proximately

enabled widespread terrorism by the NYPD across New York City since May of this year:

> Grace Rauh, Gloria Pazmino, Michael Gartland, Graham Rayman, Erin Durkin, Jillian Jorgensen, Errol Louis, Courtney Gross, Mara Gay, David Goodman, Matthew Chayes, Ben Max, Julia Marsh, Madina Toure, Yoav Gonen, Jeff C. Mays, Gwynne Hogan, Jessica Layton

27.    I recall Julia Marsh having told me during a telephone call that she threw away a copy of

my 5/19/17 order to show cause application in my HRA lawsuit after I asked her if I could get it

back from her after she informed me that the New York Post wouldn't pursue any reporting

about my HRA lawsuit. That occurred after I was recorded on video on 5/23/17 as I talked with

Mr. Gartland on 5/23/17 face-to-face inside of the Bronx Supreme Court as I was being illegally

prevented from attending the Mayor's 5/23/17 resource fair as I clearly told him then that I was

illegally prevented from attending the Mayor's 4/27/17 town hall as well and that I was a

whistleblower against the Mayor's administration and the NYPD as I also then had an ongoing

lawsuit against HRA. During that meeting, I showed him a copy of my 5/19/17 order to show

cause application that I brought with me to discuss with Mr. Banks, the Mayor, journalists, and

members of the public while attending the Mayor's 5/23/17 resource fair. I also wrote down the

index number of my HRA lawsuit and my contact information on a notepad that he handed to me

as we sat next to one another on a bench in that courthouse on 5/23/17 to enable him to follow-

up with me about my HRA lawsuit. The next 2 screenshots are from a video recording that was

recorded on 5/23/17 by a video security camera that OCA controls that was then installed above

the entrance to Room 105 on the first floor of the Bronx Supreme Court. OCA provided me that

video recording in response to a FOIL demand that I submitted to it. Those screenshots

correspond to parts of that video that were recorded between 9:30 am and 10 am on 5/23/17 as

the Mayor's 5/23/17 resource fair was conducted in the Veterans' Memorial Hall chamber

located in that courthouse during the U.S. Navy's annual "Fleet Week" event in New York City,

and while I continued to be a Navy veteran that the Mayor's administration and NYPD were

stabbing in the back by flagrantly violating my constitutional rights at public forums to steal the

2017 New York City government elections by doing their utmost to illegally silence and prevent

valid criticism against the Mayor's administration, its business partners, and members of the

NYPD at public forums that the Mayor, Mr. Banks, members of the City Council, and other

government officials jointly conducted with the public, journalists, and whistleblower news

censors in journalism. These screenshots show me as I **a)** took a notepad from Mr. Gartland for

the purpose that I discussed above and **b)** showed him the copy of my 5/19/17 order to show

cause application in my HRA lawsuit that was in a large white bag of mine.

 

28.     The following are relevant excerpts from *Piesco v. City of New York, Dept. of Personnel*

that underscore what I have discussed above:

a.      A statement that is made about the competency of a police officer "clearly is a matter of public concern" because "the police officer represents the most basic unit of government, one which arguably most affects the day-to-day lives of the citizenry".

b.      "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, *the manner in which government is operated or should be operated*, and all such matters relating to political processes."

c.      "The Supreme Court has recognized that one of the critical purposes of the first amendment is to provide society with a basis to make informed decisions about the government."

d.      The "first amendment guarantees that debate on public issues is "`uninhibited,

robust, and wide open'".

e.   Speech "on matters of public concern is that speech which lies `at the heart of the First Amendment's protection'".

f.   "A court is required to accept as true a plaintiff's allegation that retaliatory actions by the City of New York were precipitated by prior testimony he or she gave to a committee."

g.   "Without a searching inquiry into these motives, those intent on punishing the exercise of constitutional rights could easily mask their behavior behind a complex web of post hoc rationalizations."

h.   Summary "judgment is inappropriate when `questions of motive predominate in the inquiry about how big a role" "protected behavior played in" causing an adverse action to occur.

29.   The following excerpt from _McCutcheon v. Federal Election Com'n_, 134 S. Ct. 1434, 572

U.S. 185, 188 L. Ed. 2d 468 (2014) also addresses illegal prior restraints on First Amendment

rights:

a.   "The First Amendment "is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, ... in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." _Cohen v. California,_ 403 U.S. 15, 24, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). As relevant here, the First Amendment safeguards an individual's right to participate in the public debate through political expression and political association. See _Buckley,_ 424 U.S., at 15, 96 S.Ct. 612."

b.   "First Amendment rights are important regardless whether the individual is, on the one hand, a "lone pamphleteer[] or street corner orator[] in the Tom Paine mold," or is, on the other, someone who spends "substantial amounts of money in order to communicate [his] political ideas through sophisticated" means. _National Conservative Political Action Comm.,_ 470 U.S., at 493, 105 S.Ct. 1459. Either way, he is participating in an electoral debate that we have recognized is "integral to the operation of the system of government established by our Constitution." _Buckley, supra,_ at 14, 96 S.Ct. 612."

30.   The following excerpt from _New York Times Co. v. United States_, 403 U.S. 713, 91 S. Ct.

2140, 29 L. Ed. 2d 822 (1971) addresses illegal prior restraints on First Amendment rights:

"Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 70 (1963); see also *Near* v. *Minnesota,* 283 U. S. 697 (1931). The Government "thus carries a heavy burden of showing justification for the imposition of such a restraint." *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415, 419 (1971). The District Court for the Southern District of New York in the *New York Times* case and the District Court for the District of Columbia and the Court of Appeals for the District of Columbia Circuit in the *Washington Post* case held that the Government had not met that burden. We agree."

31.     The following is a relevant excerpt from *Doe v. City of New York*, No. 18-cv-670 (ARR)(JO) (E.D.N.Y. Jan. 9, 2020) that confirms that I had a First Amendment right to criticize government personnel without being retaliated against for doing so:

""[t]he right to criticize public officials is at the heart of the First Amendment's right of free speech." *Kaluczky v. City of White Plains,* 57 F.3d 202, 210 (2d Cir. 1995) (citing *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 282 (1964)). Indeed, the "right to criticize the police without reprisal" is "clearly" an "interest protected by the First Amendment," *Kerman v. City of New York,* 261 F.3d 229, 241-42 (2d Cir. 2001), as "[t]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers[,]" *id.* at 242 (quoting *City of Houston v. Hill,* 482 U.S. 451, 461 (1987)). Thus, on summary judgment, the Second Circuit has held that a plaintiff established a First Amendment retaliation claim when he proffered facts showing that police officers retaliated against him for making derogatory comments to the officers and for threatening to sue them. *Kerman,* 261 F.3d at 241-42.[3]""

32.     The following excerpt from *Puckett v. City of Glen Cove*, 631 F. Supp. 2d 226 (E.D.N.Y. 2009) reinforces the preceding findings from *Doe v. City of New York*:

"Plaintiff must first allege that she engaged in protected activity to state a First Amendment claim of retaliation. The First Amendment protects the right of access to the courts, and an individual's right to complain to public officials. *Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (right of access); *Monsky v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997) (right of access); *Patriots Way, LLC v. Marconi,* 2007 WL 988712 *4 (D.Conn.2007); *see Colondres v. Scoppetta,* 290 F.Supp.2d 376, 381 (E.D.N.Y.2003) (right of access is "bound up" with the First Amendment right to petition the government); *Gagliardi,* 18 F.3d at 194-95 (right to complain to public officials protected by First Amendment). These First Amendment rights include the right to be free from retaliation for their exercise. *Colondres,* 290 F.Supp.2d at 382; *see Patriots Way,* 2007 WL 988712 *6."

33.     *Hershey v. Kansas City Kansas Community College*, No. 2: 16-cv-2251-JTM (D. Kan.

Feb. 17, 2017) includes the following findings about standardless discretion that is used to

violate constitutional rights at public forums and confirms that those who are denied access to a

public forum in violation of their constitutional rights as a result of standardless discretion aren't

required to establish that he or she was discriminated against in that way because of the content

of his or her expression with respect to the First Amendment:

> "Because plaintiff has alleged that access to the public forum is based on "standardless discretion" of College officials, he need not show that he was discriminated against based on the content of his materials. **A government regulation that allows arbitrary application is `inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'"** Forsyth Cty., Ga. v. Nationalist Movement, 505 U.S. 123, 130 (1992)"

> (boldface formatting added for emphasis)

34.   _Hopper v. City of Pasco_, 241 F.3d 1067 (9th Cir. 2001) also addresses standardless

discretion as follows:

> "Courts have also been reluctant to accept policies based on subjective or overly general criteria. "`[S]tandards for inclusion and exclusion' in a limited public forum `must be unambiguous and definite' if the `concept of a designated public forum is to retain any vitality whatever.'" _Christ's Bride,_ 148 F.3d at 251 (quoting _Gregoire v. Centennial Sch. Distr.,_ 907 F.2d 1366, 1375 (3d Cir.1990)). Absent objective standards, government officials may use their discretion to interpret the policy as a pretext for censorship. _See Board of Educ. v. Mergens,_ 496 U.S. 226, 244-45, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (generalized definition of permissible content poses risk of arbitrary application); _Putnam Pit, Inc. v. City of Cookeville,_ 221 F.3d 834, 845-46 (6th Cir.2000) ("broad discretion [given] to city officials [raises] possibility of discriminatory application of the policy based on viewpoint"); _Cinevision Corp. v. City of Burbank,_ 745 F.2d at 560 (9th Cir.1984) (vague standard has "potential for abuse"); _Gregoire,_ 907 F.2d at 1374-75 ("virtually unlimited discretion" granted to city officials raises danger of arbitrary application); _see also City of Lakewood v. Plain Dealer Publ. Co.,_ 486 U.S. 750, 758-59, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (absence of express standards in licensing context raises dual threat of biased administration of policy and self-censorship by licensees). Therefore, "the more subjective the standard used, the more likely that the category will not meet the requirements of the first amendment." _Cinevision,_ 745 F.2d at 575; _see also Christ's Bride,_ 148 F.3d at 251 (suppression of speech under defective standard requires closer scrutiny)."

35. Prior to becoming a judge of the Second Circuit, Denny Chin was the U.S. District

Judge who issued the decision in *Million Youth March, Inc. v. Safir*, 63 F. Supp. 2d 381 (S.D.N.Y. 1999) that commenced in response to decisions that were made by the Community Affairs Unit of the New York City Mayor's Office in relation to demonstrators who sought to exercise their First Amendment rights in a public forum in New York City. Judge Chin addressed standard discretion to violate First Amendment rights and viewpoint discrimination in that decision. The following is a relevant excerpt from that decision about illegal prior restraints that were imposed on those demonstrators that led to them being granted an injunction against the NYPD to allow them to exercise their constitutional rights in a public forum:

> "The right to free speech, however, applies not only to politically correct statements but also to statements that we may disagree with and that, indeed, we may abhor. At least as frightening as the rhetoric of Mr. Muhammad is the possibility of a society where freedom of speech is not respected, and where the right to speak publicly can be denied on the basis of administrative whim, personal dislike, or disapproval of anticipated content."

> MYM's motion for a preliminary injunction is granted to the extent ordered by the Second Circuit last year in *Million Youth March, Inc. v. Safir,* 155 F.3d 124, 126 (2d Cir.1998)."

36.     The following is a relevant excerpt from the related decision that the Second Circuit issued in *Million Youth March, Inc. v. Safir*, 155 F.3d 124 (2d Cir. 1998) in which it also briefly addressed standardless discretion to violate First Amendment rights.

> In granting the injunction, the District Court properly recognized that "any permit scheme controlling the time, place, and manner of speech must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication." *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). The District Court found as a fact that the City denied the plaintiff's application in the exercise of authority pursuant either to the so-called "Activity Rules" of the Street Activity Permit Office of the Community Affairs Unit of the Office of the Mayor or a combination of the Activity Rules and the parade permit rules of Section 10-110 of the New York City Administrative Code. The Court also concluded that the Activity Rules accorded administrators unfettered discretion contrary to well established First

> Amendment limitations. *See Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). Since the City's denial was issued by the Community Affairs Unit, without any reference to Section 10-110, the record plainly supports the finding that the Activity Rules were either the exclusive authority invoked for the denial of the application or at least a substantial part of such authority. At this stage of the litigation, we have no basis to question the Court's conclusion that the standardless nature of the Activity Rules rendered the denial a violation of the First Amendment.

37.     In *Matal v. Tam*, 137 S. Ct. 1744, 582 U.S., 198 L. Ed. 2d 366 (2017), the U.S. Supreme Court stated the following about viewpoint discrimination:

> "Giving offense is a viewpoint. The "public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572. Pp. 1761-1764.

38.     On 2/19/20, a leader and trailblazer named David Rem lawfully and awesomely performed a key civic duty by standing up during the public town hall meeting that the Mayor conducted in Forest Hills in Queens as he told the Mayor that he was New York City's worst Mayor ever while that town hall meeting was recorded on video as a result of arrangements that the Mayor's office made. That video is available on the Internet at

https://www.youtube.com/watch?v=5le6DCaxiG8. Mr. Rem is shown in that video at the elapsed time of 1 hour, 37 minutes, and 55 seconds as he told the Mayor that he was New York City's worst Mayor ever. In response to that criticism, Mr. Rem received cheers and applause from members of that town hall's audience as one of those people rose from his seat to applaud Mr. Rem and pay proper respect to him for his leadership and outspokenness while taking the gloves off so to speak at the Mayor's expense in such a refreshing way during that public forum. This proves that the finding in *Cohen v. California*, 403 U.S. 15, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971) that states that "it is nevertheless often true that one man's vulgarity is another's lyric" is true during public forums that the Mayor conducts. This discussion also confirms that I had a First Amendment and Fourteenth Amendment right to beat Mr. Rem to the punch on 10/4/17 by

attending the Mayor's 10/4/17 town hall within the room in which it was conducted and similarly

criticize the Mayor, Mr. Banks, members of the Mayor's NYPD security detail, members of the

Mayor's staff, and many others while doing so. It's worth pointing out that Mr. Rem was

illegally retaliated against in violation of his First Amendment rights on 2/19/20 as the Mayor

used a hand signal to illegally direct Mr. Redmond and others to coerce Mr. Rem to abruptly

leave that town hall.

39.     The following is a relevant excerpt from _Paterno v. City of New York_, No. 17 Civ. 8278

(LGS) (S.D.N.Y. July 31, 2018) that addresses the legal standard for a "stigma-plus" claim that

corresponds to defamation:

> ""To establish a `stigma-plus' claim, a plaintiff must show (1) [stigma —] the utterance of a
> statement sufficiently derogatory to injure [plaintiff's] reputation, that is capable of being
> proved false, and that he or she claims is false, and (2) [a plus —] a material state-imposed
> burden or state-imposed alteration of the plaintiff's status or rights." _Vega v. Lantz,_ 596 F.3d
> 77, 81 (2d Cir. 2010)_; accord Dowd v. DeMarco,_ No. 17 Civ. 8924, 2018 WL 2926619, at *7
> (S.D.N.Y. June 12, 2018). Accordingly, "even where a plaintiff's allegations would be
> sufficient to demonstrate a government-imposed stigma, such defamation is not, absent more,
> a deprivation of a liberty or property interest protected by due process." _Vega,_ 596 F.3d at
> 81_; accord McNaughton v. de Blasio,_ No. 14 Civ. 221, 2015 WL 468890, at *14 (S.D.N.Y.
> Feb. 4, 2015). "Burdens that can satisfy the `plus' prong under this doctrine include the
> deprivation of a plaintiff's property, and the termination of a plaintiff's government
> employment." _Sadallah v. City of Utica,_ 383 F.3d 34, 38 (2d Cir. 2004) (internal citations
> omitted)_; accord Filteau v. Prudenti,_ 161 F. Supp. 3d 284, 294 (S.D.N.Y. 2016). "However,
> deleterious effects flowing directly from a sullied reputation, standing alone, do not
> constitute a `plus' under the `stigma plus' doctrine." _Sadallah,_ 383 F.3d at 38_; accord
> Autotech Collision Inc. v. The Inc. Vill. of Rockville Ctr.,_ 673 F. App'x 71, 74 (2d Cir.
> 2016) (summary order)."

40.     On a related note, the following findings that the Second Circuit issued in _Ragbir v.

Homan_, 923 F.3d 53 (2d Cir. 2019) address viewpoint discrimination and acts committed by

government personnel against a leading activist named Ravidath Ragbir in retaliation for efforts

that he undertook to try to attract news coverage against ICE:

> ""It is a fundamental principle of the First Amendment that the government may not
> punish or suppress speech based on disapproval of the ideas or perspectives the

speech conveys." *Matal v. Tam,* ___ U.S. ___, 137 S.Ct. 1744, 1765, 198 L.Ed.2d 366 (2017). "Such discriminat[ion] based on viewpoint is an `egregious form of content discrimination,' which is `presumptively unconstitutional.'"[24] *Id.* at 1766 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829-30, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)). The Supreme Court has further described viewpoint discrimination as a "blatant" "violation of the First Amendment." *Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510.

Ragbir's plausible allegations and evidence, which we must accept as true at this juncture, support that the Government singled him out for deportation based not only on the viewpoint of his political speech, but on the public attention it received. In a declaration by Micah Bucey, a New York City minister, Bucey asserts that ICE's New York City Field Office Director, Scott Mechkowski, stated that Ragbir and Jean Montrevil were ICE's two most prominent cases in New York City and complained that the activists' protests and comments to the press negatively portrayed ICE to the public and to others in the Government. According to Bucey, Mechkowski stated: "Nobody gets beat up in the news more than we do, every single day. It's all over the place, ... how we're the Nazi squad, we have no compassion." App'x 252. Mechkowski then stated that he had heard Ragbir's New Sanctuary cofounder Montrevil (whom ICE had also just detained) "ma[ke] some very harsh statements. I'm like, `Jean, from me to you... *you don't want to make matters worse by saying things.*" App'x 252 (emphasis added). Mechkowski then turned to Ragbir specifically, stating that it "bother[ed]" him that "there isn't anybody in this entire building that doesn't ... know about Ravi." App'x 253. "Everybody knows this case," Mechkowski stated, "[n]o matter where you go." App'x 253. Ragbir's counsel Alina Das also submitted a declaration stating that she spoke with Mechkowski, who expressed "resentment" about the events of the March 9, 2017 check-in and disapprovingly mentioned that he had heard Ragbir's statements to the press. App'x 55-56, 123.

A plausible, clear inference is drawn that Ragbir's public expression of his criticism, and its prominence, played a significant role in the recent attempts to remove him."

41.    The retaliation that Mr. Ragbir experienced in retaliation for his efforts to receive news coverage is comparable to illegal acts and omissions that were committed against me on 10/3/17 and 10/4/17 concerning **a)** the 10/3/17 public forum at 12 pm pm in front of the steps of City Hall about reforming the NYPD and **b)** the Mayor's 10/4/17 town hall that prevented me from attending them. I believe that those acts and omissions were partly driven by efforts that I undertook to attract news coverage partly about **a)** my HRA lawsuit and **b)** illegal acts and omissions that members of the Mayor's NYPD security detail, other members of the NYPD,

members of the Mayor's staff, the Mayor, Defendant O'Neill had been committing against me since 4/27/17 in relation to my efforts to lawfully attend public forums that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, other government personnel, whistleblower news censors in journalism, and journalists within the rooms in which they were conducted as they were conducted.

42.       Concerning what I just discussed, I received a 374-page PDF file from the Mayor's office on 2/15/19 in response to a FOIL demand that I submitted to it. That PDF file includes e-mail messages that senior members of the Mayor's staff, Mr. Redmond, and others sent about me in 2017 about illegal acts and omissions that were committed against me by themselves, Mr. Redmond, and others in relation to my efforts to lawfully attend public forums that consisted of public town hall meetings and public resource fair meetings in the rooms in which they were conducted as they were conducted that were conducted on 4/11/17, 4/27/17, 5/23/17, 6/8/17 by members of the public in a collaborative manner with the Mayor, Mr. Banks, members of the City Council, other government officials, whistleblower news censors in journalism, and members of the press. Redactions were applied to the many of the e-mail messages shown in that PDF file before I received it. That PDF file includes e-mail messages that were sent on 6/28/17 and 6/29/17 about me between **a)** Erin Durkin while she then worked for the New York Daily News and **b)** Defendant Ramos and the Mayor's former mouthpiece, Eric Phillips. As I partly discussed earlier in this complaint, e-mail messages in that PDF file also confirm that Jaclyn Rothenberg, Defendant Ramos, and Raquel Lucas of the Mayor's administration communicated updates on 4/10/17 and 6/28/17 to other members of the Mayor's administration about the status of my HRA lawsuit and related litigation that was assigned to OTDA that I pursued against HRA as Defendant Ramos blatantly lied to Ms. Durkin about that on 6/28/17 at 5:42 pm while she

committed defamation against me in the process:

a.    Raquel Lucas of HRA on 4/10/17 at 5:24 pm. That e-mail message served to help those who received it to engage in damage-control and intense screening against me partly in preparation for my planned attendance on 4/11/17 at the Mayor's public resource fair meeting that he would conduct in Staten Island then. That e-mail message was sent after Jeffrey Mosczyc of HRA submitted an illegal ex-parte adjournment application on 4/5/17 in my HRA lawsuit through which he and Judge Bannon used a fraudulent pretext to flagrantly commit obstruction of justice and witness tampering against me as they criminally stole my First Amendment and Fourteenth Amendment right to testify as originally scheduled in the oral arguments hearing on 4/12/17 in my HRA lawsuit. That damage-control and screening was also about **a)** my fair hearing with OTDA against HRA on 4/11/17 and **b)** whistleblowing that I engaged in as I talked with the Mayor on 3/15/17 during the town hall meeting he conducted and in an e-mail message that I sent to Shauna Stribula of the Mayor's CAU on 3/16/17 at 10:54 pm after I met her during that 3/15/17 town hall that both Mr. Gartland and Mr. Redmond attended as well before Mr. Gartland nor any other whistleblower news censor in journalism reported anything about what I talked with the Mayor about during that town hall. That e-mail message from Ms. Lucas on 4/10/17 appears on pages 211 and 212 within that PDF file and has redactions applied to it in numerous areas. Ms. Lucas then worked as a special assistant for Mr. Banks. The subject line of that e-mail message is: "Staten Island Resource Fair 4/11 Re: Towaki Komatsu". The next screenshot from that e-mail message confirms that Ms. Lucas

appised the recipients of that e-mail message of confidential litigation matters
that were between HRA and I that concerned my 4/11/17 OTDA fair hearing in
violation of applicable privacy laws that include New York State Social Services
Law §136(2) and 18 NYCRR §357:

In addition to his claims for legal services, he has also made a claim for reimbursement for three
months in 2016 ███████████████████ His claim is subject to a fair hearing before the state
tomorrow.

Also, the fact that e-mail message was sent by Ms. Lucas to the following people
naturally raises a question about what were the specific, credible, legitimate, and
justifiable reasons why 6 senior members of the Mayor's administration that
included a Harvard Law School graduate paid such special attention to me **a)** one
day before I would engage in litigation against HRA that was assigned to OTDA,
**b)** 2 days before I was then scheduled to engage in related litigation against HRA
while presenting oral arguments publicly against HRA in my HRA lawsuit while
the scope of my claims in it were far more extensive and damaging to the Mayor's
administration and its business partners, and **c)** one day before I would attend the
Mayor's 4/11/17 public resource fair meeting outside of which Mr. Banks yet
again flat-out lied to my face about my efforts to obtain pro-bono legal
representation or legal assistance from HRA's legal services partners through
referrals that I received to them by HRA as he refused to talk with me if I
recorded that conversation on video:

   i.    Mr. Banks.

   ii.   Defendant Carrion.

  iii.   Rachel Lauter. According to her career profile on the LinkedIn web site

that is available on the Internet at https://www.linkedin.com/in/rachel-lauter/, she then worked for the Mayor's office as a Deputy Chief of Staff and graduated from Harvard Law School.

    iv.    Kayla Arslanian. She was then the Deputy Director of Intergovernmental Affairs within the Mayor's office.

    v.    Jaclyn Rothenberg. She appears to have been a spokeswoman for the Mayor between April of 2017 and May of 2017.

    vi.    Jennifer Yeaw. According to her career profile on the LinkedIn web site that is available on the Internet at https://www.linkedin.com/in/jennifer-yeaw/, she then worked for the New York City Department of Social Services as its Chief of Staff.

    b.    Jaclyn Rothenberg on 6/28/17 at 5:18 pm. Ms. Rothenberg's remarks in the e-mail message that she sent at 5:18 pm on 6/28/17 to others in the Mayor's administration and Defendant Redmond about me, my HRA lawsuit, and town hall meetings that the Mayor conducted that I discussed earlier in this complaint refers to the oral arguments hearing that was conducted on 6/7/17 in my HRA lawsuit to make up for the 4/12/17 oral arguments hearing that Judge Bannon and Mr. Mosczyc's criminally stole from me. Ms. Rothenberg also referred to an order to show cause application that I served upon HRA on 6/6/17 at its office located at 150 Greenwich Street in Manhattan. That address is also known as 4 World Trade and "4WTC".

43.    After sending that e-mail message at 5:18 pm on 6/28/17 about me, Ms. Rothenberg sent another e-mail message on 6/29/17 at 9:43 am that appears on pages 361 and 362 in the 374-page

PDF file, is heavily redacted, and was also about me and town halls as confirmed by the subject line in both of those e-mail messages.  That 6/29/17 9:43 am e-mail message was sent to the following people:

> Defendant Ramos, Mr. Carrion, Ricky Da Costa, Andrea Hagelgans, Eric Phillips, Mr. Redmond, Michael Casca, Kayla Arslanian, Emma Wolfe, Jeff Lynch, and Shauna Stribula

44.     I recorded Ms. Stribula on 4/27/17 in the immediate area of where I was near the entrance to the school that hosted the Mayor's 4/27/17 town hall as I was being illegally prevented from entering that school to have to resort to watching how that town hall was conducted on a television screen in an overflow room instead of within the room in which it was conducted after I was issued an admission ticket to access that overflow room by a female member of the Mayor's staff on 4/27/17 at that site. I recorded Ms. Stribula then largely because I observed her behaving in a manner that suggested that she was part of a criminal conspiracy that then existed between Mr. Redmond and Andrew Berkowitz of the Mayor's NYPD security detail as well as Harold Miller and Pinny Ringel of the Mayor's CAU to illegally prevent me from attending that town hall in violation of **a)** 18 U.S.C. §245(b)(5), 18 U.S.C. §241, NYPL §240.20, NYPL §240.26, NYPL §175.25, 5 U.S.C. §1502(a)(1), **b)** my constitutional rights, and **c)** other applicable laws.

45.     On 6/24/17, an eyewitness of mine sent an e-mail message at 4:26 pm to a whistleblower news censor in journalism named Graham Rayman who works for the New York Daily News about what that witness and I experienced on 6/8/17 as we tried to lawfully attend the Mayor's 6/8/17 town hall from within the room in which it was conducted as it was conducted. What follows shows **a)** the header section from that e-mail message without the sender's information and **b)** 2 excerpts from the body of that e-mail message. Since I previously agreed to respect that

witness' privacy, I'm not disclosing the identity nor gender of that witness who then worked for

the New York State Attorney General's office and I had just met by chance for the first time on

6/8/7. In that e-mail message, "the guard" refers to Mr. Gerola and the "Mayor's staff member"

refers to Ms. Stribula.

> **Subject:** Re: Information about police misconduct on 6/8 at Mayor's public town hall
> meeting in Rego Park
> **Date:** June 24, 2017 at 4:26:20 PM EDT
> **To:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Cc:** "Rayman, Graham" <grayman@nydailynews.com>
>
> a.   "I would just like to add that I was allowed to write my question on a card, after
>       which the guard told me they would allow me in to ask the question after they
>       reviewed it and people emptied the room. As the room emptied, they did not let
>       me in saying that the room was full even though we saw empty seats in the TV
>       screens. When I asked a Mayor's staff member why they wouldn't let me in, she
>       explained it was because I was associated with Towaki and he was a "harasser",
>       but did not explain anything else to me."
>
> b.   "I just met him that day. I also think maybe they did not let me in because they
>       did not like my question which was about police accountability, but I'm not sure
>       about that since I know someone else in the room was allowed to ask a question
>       about broken windows policing. Also, please keep my name anonymous.
>       Thanks."

46.      Contrary to a fraudulent remark that Ms. Stribula expressed to that witness that appears

that e-mail message by claiming that I was a "harasser", I was certainly a whistleblower against

the Mayor's administration, the NYPD, HRA, Mr. Banks, and HRA's business partners then

after I had been criminally harassed by members of the Mayor's NYPD security detail, other

members of the NYPD, members of the Mayor's staff, HRA, and HRA's business partners

leading up to that date at public forums and in other ways that enabled me to be viciously

assaulted on 7/2/16. T hat 7/2/16 assault involved me having been brutally punched on my head

near my left temple more than 15 times by my former roommate (Ronald Sullivan) in the living

room of where I reside. That caused me to sustain a concussion that in turn cost me my ability to

perform well during a job interview that I had on 8/18/16 for a job that offered to pay $450 daily. That assault was enabled by HRA having criminally and jointly subjected me to a bait-and-switch fraud and forgery with Urban that concerned the binding and fully-enforceable apartment lease agreement that I signed on 2/16/16 in HRA's offices located at 33 Beaver Street in Manhattan with Lisa Lombardi of Urban. I signed that agreement in front of witnesses to be issued sole possession of apartment 4C in the building in which I reside with no roommate and in a fully-furnished condition shortly thereafter

47.     Records that HRA has maintained about me and provided to me confirm that HRA illegally altered that lease agreement within 2 days after I signed it. Urban's personnel thereafter issued me a patently invalid and fraudulent lease on or about 3/7/16 that included a photocopy of the signature page that was from the actual lease that I signed on 2/16/16. While doing so on or about 3/7/16, Urban's personnel issued me shared possession of apartment 4B within the building in which I reside that included a time bomb named Ronald Sullivan as a roommate. HRA's records also confirm that I reported that illegal bait-and-switch fraud and forgery to HRA on 3/16/16 prior to realizing that HRA illegally altered my lease within 2 days after I signed it. I also met with HRA's ombudsman's staff on 3/10/16 in its offices located at 33 Beaver Street during which I reported that illegal bait-and-switch fraud and forgery. However, HRA illegally failed to remedy that that illegal bait-and-switch fraud and forgery that it criminally perpetrated against me.

48.     Prior to assaulting me on 7/2/16 in the living room of our shared apartment, Mr. Sullivan tried to do precisely that on 5/12/16 in that living room while we were in the immediate presence of one of Urban's personnel named Thomas Fair. However, Mr. Fair physically restrained him as he suddenly rushed toward me to assault me. He tried that right after he had been making verbal

threats to do so in Mr. Fair's presence. Although I promptly sent cell phone text messages on 5/12/16 to someone Molly McCracken to have her function as an intermediary between Urban and I to convey my demands to Urban for it to immediately evict Mr. Sullivan because he just proved that he was a clear threat to my safety where I resided, Ms. McCracken informed me that my demands were rejected. Ms. McCracken then worked for an organization named Services for the Services, Inc. ("SUS") that is a business partner of HRA. On 5/19/16, I had telephone conversations with Ms. Lombardi and Ronald Abad of Urban to try to persuade them to immediately evict Mr. Sullivan. They refused. Urban's personnel were required by applicable law to immediately notify both HRA and OTDA in response to Mr. Sullivan's attempted assault against me on 5/12/16 and his actual assault against me on 7/2/16. His 7/2/16 assault against me was both foreseeable and preventable by them and Urban. Also, though 18 NYCRR §491.9(c) prohibited Mr. Sullivan from residing in the building in which I reside without OTDA's approval because of the threat that he posed to my comfort and safety in it, he was able to do so even after he viciously assaulted me on 7/2/16 until I was finally issued an order of protection against him on or about 10/6/6 by the Bronx District Attorney's office. In fact, the NYPD unconscionably released Mr. Sullivan on 7/11/16 after arresting him then for having assaulted me on 7/2/16 where I reside.

49.    To wrap up this discussion of Mr. Sullivan, the Bronx District Attorney's office engaged in prosecutorial misconduct as it prosecuted Mr. Sullivan for assaulting me on 7/2/16. It did so by not presenting any witness other than me in that case in spite of the fact that Mr. Sullivan made incriminating remarks to another tenant on 7/2/16 in the building I which I reside as Mr. Sullivan fled from the building in which I reside. Mr. Sullivan told that witness that he had just assaulted me in our apartment and described how he did so. The Bronx District Attorney's office

also engaged in misconduct by not pursuing an appeal as far as it could have of the arbitrary and capricious ruling that Bronx Criminal Court Judge Cori Weston issued in the criminal case against Mr. Sullivan for assaulting me on 7/2/16. That ruling suppressed information from an admissible security log that was maintained by Urban's personnel who worked inside of the building in which I reside. Information in that log included remarks by Urban's personnel on 7/2/16 about the fact that they observed Mr. Sullivan appearing angry as he fled from the building in which he had just assaulted me. The Mayor appointed Cori Weston as a judge. Due to what I just discussed, Mr. Sullivan was fraudulently found not guilty by Judge Weston in February of 2017. _Johnson v. NYC HEALTH & HOSPS_, 246 A.D.2d 88, 676 N.Y.S.2d 38, 676 N.Y.S. 38 (App. Div. 1998) established a precedent that confirmed that security logs are admissible evidence in criminal cases.

50.     What follows shows e-mail messages that I sent to and received from Graham Rayman on 6/28/17 that concerned a news article that he claimed he was working on that would be about my having been illegally prevented from attending public town hall and public resource fair meetings that the Mayor conducted with others since 4/27/17. Nothing was ever reported about that by him nor anyone else who then worked for the New York Daily News in spite of the fact that an eyewitness confirmed to him that it had occurred on 6/8/17 and Jessica Ramos confirmed to Ms. Durkin on 6/28/17 that it had occurred as she lied to Ms. Durkin about why it occurred. Mr. Rayman was then working with Ms. Durkin about that possible news article. Also, nothing was ever reported about that in spite of the fact that a photojournalist for the New York Daily News named Jefferson Siegel took photographs of me in front of the NYPD's headquarters for the news article that Mr. Rayman expressed to me that he was working on.

> **From:** "Rayman, Graham" <grayman@nydailynews.com>
> **Subject:** Re: My RSVP for 5/23 Bronx Resource Fair!

**Date:** June 28, 2017 at 6:16:01 PM EDT
**To:** Towaki_Komatsu <towaki_komatsu@yahoo.com>

Ok thanks. Will continue working on it tomorrow.

Sent from my iPhone

On Jun 28, 2017, at 6:09 PM, Towaki_Komatsu <towaki_komatsu@yahoo.com> wrote:
By the way, I've got a video of NYPD Officer Gerola telling me on 4/27 after 10 pm that
it was the Mayor's staff that was responsible for having kept me out of that event.
Unfortunately, my phone was pointed at the ground as I accidentally recorded that video.
Also, I then talked with both Nic Gulotta and Harold Miller of his staff to try to get an
explanation about why I had been discriminated against by Redmond on 4/27. I met
Harold Miller on 4/11 in Staten Island's Borough Hall after Mr. Banks lied to me outside
that building.

On Jun 28, 2017, at 5:41 PM, Rayman, Graham <grayman@nydailynews.com> wrote:

Was it the resource fair you were barred from, or the mayor's Bronx town hall? Those
were two separate events.

51.    Similarly, what follows shows an e-mail message that I received from Mr. Gartland on

7/16/17 at 3:31 pm as well as an e-mail message that I sent to him on that date at 3:26 pm. Mr.

Gartland clearly expressed to me then that the New York Post was planning to issue a news

report about my having been illegally barred from public forums since 4/27/17 that the Mayor

and others had been conducting. However, neither he nor anyone else who then worked for the

New York Post ever reported anything about that and wasted my time instead while proving to

be useless.

**From:** Michael Gartland <mgartland@nypost.com>
**Subject:** Re: 4-27-17 audio clip of NYPD Officer Gerola (badge #: 6577) proving Jessica
Ramos lied to Jill Jorgensen
**Date:** July 16, 2017 at 3:31:27 PM EDT
**To:** Towaki_Komatsu <towaki_komatsu@yahoo.com>

We're planning a story for tomorrow. Pls keep your cell handy.

On Jul 16, 2017, at 3:26 PM, Towaki_Komatsu <towaki_komatsu@yahoo.com> wrote:

Hi Michael,

As discussed, attached is a video recording I accidentally recorded on 4-27-17 while talking with NYPD Officer Gerola at about 10:20 pm right outside of the school in Long Island City that hosted the Mayor's town hall on that date.

Although Mr. Gerola isn't seen in the video (except for his shoes and leg) because I didn't mean to be recording, he can be heard in it clearly expressing that the Mayor's staff controls who is allowed to attend his town halls. That remark directly contradicts Jessica Ramos' remark in Jill Jorgensen's article I shared with you.

Also, the video clip is part of a longer recording I made shortly after I was shoved 3 times in the chest by NYPD Officer Beato (badge #: 13326) of the 108th Precinct. Prior to shoving me, he illegally ordered me to move from where I legally stood on the sidewalk adjacent to that school in order to ask the Mayor from a sufficient distance away what he was willing to do about the fact that the head of his security detail (Howard Redmond) illegally subjected me to viewpoint discrimination by not letting me attend that town hall.

Since I was standing roughly 45 feet away from where the Mayor later left that building to ask him this question before Mr. Beato shoved me and Mr. Gerola let me stand within roughly 15 feet of him on April 11th in Staten Island, it was entirely clear I had a legal right to remain where I stood on the sidewalk to ask the Mayor my question.

People who witnessed Mr. Beato shoving me were Lieutenant Nieves, a 2nd ordinary NYPD officer, and Mr. Gerola.

Regards,

Towaki

Tel: 201-315-5484

52.     What I have discussed above about whistleblowing and litigation I engaged in were

among other things that I intended to engage in protected whistleblowing and political speech

and expression about that were of public concern while attending the **a)** 10/3/17 public forum at

12 pm pm in front of the steps of City Hall about reforming the NYPD and **b)** the Mayor's

10/4/17 town hall partly to try to prevent others from suffering similar hardships largely by

trying to have those responsible for them to be immediately fired and criminally prosecuted.

53.     The following is a relevant excerpt from _Walsh v. Enge_, 154 F. Supp. 3d 1113 (D. Or.

2015) that makes it clear that the judge who issued it refused to accept the practice of

prospectively barring someone from public forums without due process being accorded:

> "This case requires the Court to decide whether the First Amendment allows a Mayor or
> his or her designee, acting pursuant to a city ordinance, to exclude a person, potentially
> indefinitely, from attending future City Council meetings to which the public is otherwise
> invited to attend and present their opinions simply because the person has been disruptive
> at previous meetings. The First Amendment protects, among other things, "freedom of
> speech" and "petitioning for a governmental redress of grievances." U.S. Const. amend. I.
> The First Amendment is incorporated into the Fourteenth Amendment and thus applies to
> the states and local governmental bodies. _Gitlow v. New York,_ 268 U.S. 652, 666, 45
> S.Ct. 625, 69 L.Ed. 1138 (1925). No appellate opinion of which this Court is aware has
> ever held that the First Amendment permits prospective exclusion orders from otherwise
> public city council meetings. A presiding officer may remove a disruptive individual
> from any particular meeting, and a sufficiently disruptive person may even be prosecuted
> for such conduct if public law permits. But no matter how many meetings of a city
> council a person disrupts, he or she does not forfeit or lose the future ability to exercise
> constitutional rights and may not be prospectively barred from attending future meetings.
> Our democratic republic is not so fragile, and our First Amendment is not so weak."

54.     In a similar vein, _Karem v. Trump_, No. 19 Civ. 2514 (D.D.C. Sep. 3, 2019), _Cable News_

_Network, Inc. v. Trump_, No. 18 Civ. 2610 (D.D.C. Nov. 16, 2018), _Nicholas v. Bratton_, No. 15-

CV-9592 (JPO) (S.D.N.Y. May 23, 2019) concerned fraudulent pretexts that were employed by

the White House and NYPD to violate the First Amendment, Fifth Amendment, and Fourteenth

Amendment rights of journalists named Brian Karem, Jim Acosta, and Jason Nicholas in regards

to their ability to use press credentials partly to gain access to meetings conducted by despicable

government officials who **a)** disavow civil rights, **b)** benefit from voter fraud and voter

suppression and **c)** are devoid of values and integrity. Ultimately, Donald Trump, the White

House, and the NYPD lost and otherwise relented in response to those lawsuits by returning

press credentials to Mr. Karem, Mr. Acosta, and Mr. Nicholas. Press credentials are functionally

equivalent to admission tickets that are issued to members of the public that grant them access to

town hall meetings that the Mayor conducts within the rooms in which they're conducted. In

particular, findings in <u>Nicholas v. Bratton</u>, No. 15-CV-9592 (JPO) (S.D.N.Y. Feb. 27, 2017) is

quite pertinent because it discusses both a fraudulent pretext that the NYPD used against Mr.

Nicholas and his contention that that practice amounted to "pre-emptive censorship" against him.

Defendant Ramos communicated fraudulent pretexts to Ms. Durkin about why I was illegally

barred from public forums that the Mayor conducted with others since 4/27/17. She did so as she

pointed out to Ms. Durkin in the e-mail message that she sent to her on 6/28/17 at 3:27 pm that I

discussed earlier in this complaint that I would continue to be illegally barred from attending

public town hall meetings that the Mayor conducted with others with respect to my ability to

attend them from within the rooms in which they would be conducted as they were conducted.

That practice indisputably was illegal "pre-emptive censorship" and a prior restraint against my

constitutional rights.

55.      The following is a pertinent excerpt from <u>In re Kaiser,</u> 722 F.2d 1574 (2d Cir. 1983)

about mendacity that is particularly applicable to my claims in this pleading and lies that Ms.

Ramos expressed to Ms. Durkin about me in e-mail messages that appear in the 374-page PDF

file:

> "the cumulative effect of all the falsehoods together evidences a pattern of reckless and
> cavalier disregard for the truth serious enough to supply the necessary fraudulent intent
> required"

56.      The following excerpt from <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 113 S. Ct.

2742, 125 L. Ed. 2d 407 (1993) further discusses mendacity in the context of discriminatory

intent:

> "The factfinder's disbelief of the reasons put forward by the defendant (particularly if
> disbelief is accompanied by a suspicion of mendacity) may, together with the elements of
> the prima facie case, suffice to show intentional discrimination. Thus, rejection of the
> defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of

intentional discrimination,[4] and the Court of Appeals was correct when it noted that, upon such rejection, "[n]o additional proof of discrimination is *required*, " 970 F. 2d, at 493 (emphasis added). But the Court of Appeals' holding that rejection of the defendant's proffered reasons *compels* judgment for the plaintiff disregards the fundamental principle of Rule 301 that a presumption does not shift the burden of proof, and ignores our repeated admonition that the Title VII plaintiff at all times bears the "ultimate burden of persuasion.""

57.     The following is a pertinent excerpt from *Regional Economic Community v. City of*

*Middletown*, 294 F.3d 35 (2d Cir. 2002) that concerns discriminatory intent and how it may be

inferred:

> "Discriminatory intent may be inferred from the totality of the circumstances, including
> ... the historical background of the decision ...; the specific sequence of events leading up
> to the challenged decision ...; [and] contemporary statements by members of the decision-
> making body...." *LeBlanc,* 67 F.3d at 425 (citations and internal quotation marks
> omitted)."

58.     *Nicholas v. Bratton,* No. 15-CV-9592 (JPO) (S.D.N.Y. Mar. 26, 2019) includes the

following finding that concerns the right to engage in discovery by obtaining non-redacted

copies of e-mail messages in order to uncover discriminatory intent and fraudulent pretexts:

> "The Court previously ordered that portions of the email chain at Docket Number 188-24,
> referred to by the Parties as "Exhibit 27," be redacted and filed under seal. (*See* Dkt. Nos.
> 189, 192.) "Because of the importance of th[is] sealed material to [the] disposition of this
> matter, [the Court] order[s] that [this email chain now] be unsealed." *Cox v. Onondaga
> Cty. Sheriff's Dep't,* 760 F.3d 139, 150 (2d Cir. 2014).

59.     In *Trump v. Vance*, 591 S. Ct. (U.S. 2020), the U.S. Supreme Court stated the following

about discovery:

> "In our judicial system, "the public has a right to everyman's evidence.""

60.     *Va. Pharmacy Bd. v. Va. Consumer Council*, 425 U.S. 748, 96 S. Ct. 1817, 48 L. Ed. 2d

346 (1976) includes the following relevant findings about the mutual right to communicate and

receive information from speakers that applies to the fact that I was illegally prevented from

attending **a)** the 10/3/17 public forum at 12 pm pm in front of the steps of City Hall about

reforming the NYPD and **b)** the Mayor's 10/4/17 town hall during which I would have otherwise

lawfully **a)** communicated quietly in a non-disruptive manner with those who would have been

then near me and been willing to do so with me:

    a.    "we acknowledged that this Court has referred to a First Amendment right to
"receive information and ideas," and that freedom of speech " `necessarily
protects the right to receive.'"

    b.    "Freedom of speech presupposes a willing speaker. But where a speaker exists, as
is the case here,[14] the protection afforded is to the communication, to its source
and to its recipients both. This is clear from the decided cases."

61.    *Schneider v. State (Town of Irvington)*, 308 U.S. 147, 60 S. Ct. 146, 84 L. Ed. 155 (1939)

confirms that people have a First Amendment to peaceably assemble and distribute literature in a

public forum when and where they choose to do so in the absence of a government restriction

that is objectively valid in stark contrast to a self-serving and fraudulent pretext manufactured by

the NYPD and Mayor's office to prevent and otherwise minimize criticism for the sake of optics.

62.    The following is an excerpt from *Karem v. Trump*, No. 19-CV-5255 (D.C. Cir. June 5,

2020) that addressed what is required of due process in the context of a denial of access to

government officials through the revocation of a press credential:

> "A fundamental principle in our legal system," the Supreme Court observed in *FCC
> v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012), "is that laws which regulate
> persons or entities must give fair notice of conduct that is forbidden or required." *Id*.
> at 253. Such "[e]lementary notions of fairness," the Court explained in *BMW of North
> America, Inc. v. Gore*, 517 U.S. 559 (1996), "dictate that a person receive fair notice
> not only of the conduct that will subject him to punishment, but also of the severity of
> the penalty that [the government] may impose." *Id*. at 574. "This requirement of
> clarity[,] . . . essential to the protections provided by the Due Process Clause of the
> Fifth Amendment," *Fox Television*, 567 U.S. at 253, "is implicated" whenever the
> government imposes "civil penalties," *Gore*, 517 U.S. at 574 n.22 (emphasis
> omitted). Where such penalties "threaten[] to inhibit the exercise of constitutionally
> protected rights[,] . . . a more stringent vagueness [and fair-notice] test should apply."
> *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99
> (1982).
>
> That "essential . . . protection[]" of fair notice applies here. *Fox Television*, 567 U.S.

at 253. As we explained in *Sherrill*, "the interest of a bona fide Washington correspondent in obtaining a White House press pass . . . undoubtedly qualifies as [a] liberty [interest] which may not be denied without due process of law under the fifth amendment." 569 F.2d at 130–131. And because "any deprivation" of a protected liberty interest must "be effected pursuant to constitutionally adequate procedures," *Brandon v. District of Columbia Board of Parole*, 823 F.2d 644, 648 (D.C. Cir. 1987), a duly issued hard pass may not be suspended without due process. Accordingly, "[e]lementary notions of fairness" required that Karem "receive fair notice not only of the conduct that [would] subject him to punishment, but also of the . . . magnitude of the sanction that [the White House] might impose." *Gore*, 517 U.S. at 574. Furthermore, because the suspension of a hard pass, like the denial of a hard pass, "implicate[s]" "important first amendment rights," *Sherrill*, 569 F.2d at 130, we evaluate Karem's suspension under a particularly "stringent vagueness [and fair-notice] test," *Village of Hoffman Estates*, 455 U.S. at 498–99.

Applying that test, we think Karem's due process claim is likely to succeed because, on this record, nothing put him on notice of "the magnitude of the sanction"—a month-long loss of his White House access, an eon in today's news business—that the White House "might impose" for his purportedly unprofessional conduct at the non-press-conference event. *Gore*, 517 U.S. at 574.

63.     The following pertinent excerpt from the U.S. Supreme Court's decision in *Buckley v. American Constitutional Law Foundation, Inc.,* 525 U.S. 182, 119 S. Ct. 636, 142 L. Ed. 2d 599 (1999) that concerns whistleblowing, government accountability, and transparency:

"[a] public armed with information . . . is better able to detect" wrongdoing. See *id.,* at 67; see also *Grosjean* v. *American Press Co.,* 297 U. S. 233, 250 (1936) (observing that an "informed public opinion is the most potent of all restraints upon misgovernment"). "`Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.' " *Buckley v. Valeo, supra,* at 67, and n. 80 (quoting L. Brandeis, Other People's Money 62 (1933))."

64. The following are relevant excerpts from *Housing Works, Inc. v. Turner*, 00 Civ. 1122 (LAK)(JCF) (S.D.N.Y. Sept. 15, 2004) that address proving retaliation and violations of equal protection:

a.   "A plaintiff's circumstantial evidence of retaliation could include the timing of the defendant's actions, such as when the alleged retaliation closely follows the plaintiff's speech. *Morris*, 196 F.3d at 110; *McCullough v. Wyandanch Union Free School District*, 187 F.3d 272, 280 (2d Cir. 1999). The plaintiff can also proffer evidence of unequal treatment, or an ongoing campaign of retaliation. *Hampton Bays*

Connections, Inc. v. Duffy, 127 F. Supp. 2d 364, 374 (E.D.N.Y. 2001); Economic Opportunity Commission of Nassau County, Inc. v. County of Nassau, 106 F. Supp. 2d 433, 437 (E.D.N.Y. 2000) (citing Gagliardi v. Village of Pawling, 18 F.3d 188, 195 (2d Cir. 1994))."

b.  "To prove an Olech-type equal protection claim, the plaintiff must show that there was "no rational basis" for the differential treatment it suffered. Wantanabe, 315 F. Supp. 2d at 396. The Second Circuit has not decided whether an Olech claim also requires a showing a illicit motive or intent on the part of the defendant."

65.  _Housing Works, Inc. v. Turner_ was a case that was partly about First Amendment retaliation that senior HRA personnel allegedly committed in response to an Article 78 proceeding that was commenced against HRA and complaints that were reported against HRA. My claims in this action are similarly about First Amendment retaliation that I experienced at **a)** the 10/3/17 public forum at 12 pm pm in front of the steps of City Hall about reforming the NYPD and **b)** the Mayor's 10/4/17 town hall while I had ongoing litigation against HRA that was a hybrid proceeding that was comprised of article 78 claims and plenary claims.

66.  _Hansen v. Harris_, 619 F.2d 942 (2d Cir. 1980) includes the following relevant findings about estoppel:

"The Government may sometimes be estopped from enforcing its rules, based on the conduct of its agents."

67.  _Barboza v. D'Agata,_ 151 F. Supp. 3d 363 (S.D.N.Y. 2015) includes the following relevant findings that confirms that people are permitted to use crude and offensive speech in the context of complaining about government activity:

"The Court of Appeals found this was in the scope of protected speech because defendant's messages were crude and offensive but made in the context of complaining about government action on a telephone answering machine set up for the purpose, among others, of receiving complaints from the public. Mangano 571. That decision is on all fours with this case. It dealt with offensive language used to express to government employees dissatisfaction with government action"

68.  _Hammock v. Pierce_, No. 15-CV-09052 (NSR) (S.D.N.Y. May 7, 2018) contains the

following findings that addresses proving a retaliatory motive:

> "retaliatory motive may be inferred from a number of circumstantial factors, including, *inter alia, "(i)* the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter, and (iv) statements by the defendant concerning his motivation." *Burton v. Lynch,* 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009)"

69. According to *Jovanovic v. City of New York*, 04 Civ. 8437 (PAC) (S.D.N.Y. Aug. 17, 2006), "malice may be inferred from the lack of probable cause."

70. The following is a pertinent excerpt from *Frain v. Baron*, 307 F. Supp. 27 (E.D.N.Y. 1969):

> "Fear of disorder, which the City cites to justify its policy, has been ruled out as a ground for limiting peaceful exercise of First Amendment rights. Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963)."

71. The following is a relevant excerpt from *Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899 (8th Cir. 2012) that concerns having a court issue an order that restrains acts that may otherwise be lawful due to a propensity and proclivity to commit unlawful conduct:

> "a district court has authority to issue a broad injunction in cases where "a proclivity for unlawful conduct has been shown." *See McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 192, 69 S.Ct. 497, 93 L.Ed. 599 (1949). The district court is even permitted to "enjoin certain otherwise lawful conduct" where "the defendant's conduct has demonstrated only unlawful conduct would not effectively protect the plaintiff's rights against future encroachment." *Russian Media Grp., LLC v. Cable America, Inc.,* 598 F.3d 302, 307 (7th Cir.2010) (citing authorities). If a party has violated the governing statute, then a court may in appropriate circumstances enjoin conduct that allowed the prohibited actions to occur, even if that conduct "standing alone, would have been unassailable." *EEOC v. Wilson Metal Casket Co.,* 24 F.3d 836, 842 (6th Cir.1994) (internal quotation omitted)."

72. The excerpts that appear next are from *People v. Alba*, 81 A.D.2d 345, 440 N.Y.S.2d 230 (App. Div. 1981) and *Dotson v. Farrugia*, No. Civ. 1126 (PAE) (S.D.N.Y. Mar. 26, 2012). Both of them confirm that an unofficial arrest occurs in violation of the Fourth Amendment when individuals have their ability to freely move about curtailed by a show of authority without a

legal justification. This is applicable to the efforts that I undertook to lawfully attend **a)** the

10/3/17 public forum at 12 pm pm in front of the steps of City Hall about reforming the NYPD

and **b)** the Mayor's 10/4/17 town hall.

    a.   **Excerpt from *People v. Alba*:**

> "The majority finds that, although defendant was told that he was "under arrest",
> no arrest, in fact, took place. We disagree. "Whenever an individual is physically
> or constructively detained by virtue of a significant interruption of his liberty of
> movement as a result of police action, that individual has been seized within the
> meaning of the Fourth Amendment". (*People v Cantor*, 36 NY2d, at p 111; see
> *Terry v Ohio*, 392 US, at p 16.)"

    b.   **Excerpt from *Dotson v. Farrugia*:**

> ""A person is seized by the police and thus entitled to challenge the government's
> action under the Fourth Amendment when the officer, by means of physical force
> or show of authority terminates or restrains his freedom of movement through
> means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (internal
> quotations marks and citations omitted) (emphasis in original); see also *Terry*, 392
> U.S. at 19 n.16"

73.    In *DK BY LK v. Teams*, No. 16-CV-3246 (PAE)(S.D.N.Y. Jul. 5, 2017), U.S. District

Judge Paul A. Engelmayer articulated the legal standard that applies to confirming personal

involvement of a defendant for 42 U.S.C. §1983 claims in the following way:

> "The personal involvement of a defendant sued in his or her individual capacity is a
> requirement for liability under § 1983; a defendant's supervisory authority is insufficient
> in itself to create liability under § 1983. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir.
> 2003). "To proximately cause a ... due process violation ... a defendant must be
> personally involved in the violation. A plaintiff may establish such personal involvement
> by making any one of five showings (the `Colon factors')." *Warren v. Pataki*, 823 F.3d
> 125, 136 (2d Cir. 2016) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).
> These showings are as follows: "(1) the defendant participated directly in the alleged
> constitutional violation, (2) the defendant, after being informed of the violation *354
> through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy
> or custom under which unconstitutional practices occurred, or allowed the continuance of
> such a policy or custom, (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate
> indifference to the rights of [the plaintiffs] by failing to act on information that
> unconstitutional acts were occurring." Id. (quoting *Colon*, 58 F.3d at 873); *see also*
> *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004) (" [A] plaintiff must

establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his [or her] individual capacity under § 1983. Personal involvement ... includes not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations were occurring.") (citations omitted))."

74.    In _An v. City of New York_, 230 F. Supp. 3d 224 (S.D.N.Y. 2017), U.S. District Judge

Lorna Schofield discussed the legal standard for claims pertaining to failure to train and

supervise as well as deliberate indifference in the following way:

> As to the failure to train or supervise theory, the Complaint does not adequately allege the equivalent of an official policy because it does not plead deliberate indifference. "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." _Connick,_ 563 U.S. at 61, 131 S.Ct. 1350 (internal quotation marks omitted). Deliberate indifference under a failure to train or supervise theory has three requirements:
>
> > First, the plaintiff must show that a policymaker knows to a moral certainty that her employees will confront a given situation. Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.
>
> _Jenkins v. City of New York,_ 478 F.3d 76, 94 (2d Cir. 2007) (internal quotation marks and citations omitted); _see also Walker v. City of New York,_ 974 F.2d 293, 297-98 (2d Cir. 1992).
>
> "The operative inquiry is whether th[e] facts demonstrate that the policymaker's inaction was the result of conscious choice and not mere negligence." _Cash v. Cty. of Erie,_ 654 F.3d 324, 334 (2d Cir. 2011) (internal quotation marks omitted). Thus a failure to act "satisfies the policy or custom requirement only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." _Reynolds v. Giuliani,_ 506 F.3d 183, 192 (2d Cir. 2007). "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." _Vann v. City of New York,_ 72 F.3d 1040, 1049 (2d Cir. 1995).

75.    The following excerpts from _Nigro v. City of New York_, No. 19-CV-2369 (JMF)

(S.D.N.Y. Sept. 11, 2020) also address legal standards that apply to claims for municipal liability

deliberate indifference:

a.  "when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." _Connick,_ 563 U.S. at 61."

b.  "although Nigro's citations to unrelated police encounters, letters, and post-hoc reports are not enough to establish a widespread custom or practice of retaliating against the press and public, "they do permit a plausible inference of deliberate indifference." _Case v. City of New York,_ 233 F. Supp. 3d 372, 406 (S.D.N.Y. 2017). In particular, the alleged incidents plausibly establish a history of NYPD officers mishandling situations where the press is involved, resulting in the repeated deprivation of constitutional rights."

76.  The following is a pertinent excerpt from _Marom v. City of New York_, No. 15-cv-2017 (PKC) (S.D.N.Y. Mar. 7, 2016) that addresses the legal duty that all law-enforcement personnel that includes lawmakers have to intervene to protect constitutional rights against infringement:

"All law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson, 17 F.3d at 557. "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, [] (2) that a citizen has been unjustifiably arrested [] or (3) that any constitutional violation has been committed by a law enforcement official []." Id. However, "[i]n order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring.""

77.  The following is a pertinent excerpt from _Marom v. NYPD Sergeant Fior Blanco,_ No. 15-cv-2017 (PKC) (S.D.N.Y. July 25, 2019) that acknowledged that the scope of personal involvement in violating constitutional rights exceeded how it was described in _Marom v. City of New York_, No. 15-cv-2017 (PKC) (S.D.N.Y. Mar. 7, 2016):

"A defendant is also considered "personally involved" if he or she fails to intervene despite having a realistic opportunity to prevent the constitutional violation from occurring. Harris v. City of New York, No. 15-cv-8456 (CM), 2017 WL 6501912, at *3 (S.D.N.Y. Dec. 15, 2017); see Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)."

78.  The following is a pertinent excerpt from _Bleiwas v. City of New York_, No. 15 Civ. 10046 (ER) (S.D.N.Y. Aug. 14, 2017) that lists the elements for a claim based upon negligence:

"To demonstrate that a defendant acted with negligence under New York law, a plaintiff must show `1) the existence of a duty flowing from defendant to plaintiff; 2) a breach of this duty; 3) a reasonably close causal connection between the contact and the resulting injury; and 4) actual loss, harm or damage."

79. What follows is a pertinent excerpt from US v. Basey, 816 F.2d 980 (5th Cir. 1987) about the guilt of those who participate in conspiracies and clearly confirms that defendants that I have listed in this pleading's caption have been involved in a conspiracy to violate my constitutional right to attend **a)** the 10/3/17 public forum at 12 pm pm in front of the steps of City Hall about reforming the NYPD and **b)** the Mayor's 10/4/17 town hall

**Excerpt from US v. Basey**:

"Well settled is the principle that a party to a continuing conspiracy may be responsible for a substantive offense committed by a co-conspirator, even though that party does not participate in the substantive offense or have any knowledge of it. Pinkerton v. United States, 328 U.S. 640, 647, 66 S.Ct. 1180 [1184] 90 L.Ed. 1489 (1946). Once the conspiracy and a particular defendant's knowing participation in it has been established beyond a reasonable doubt, the defendant is deemed guilty of substantive acts committed in furtherance of the conspiracy by any of his criminal partners. United States v. Sullivan, 578 F.2d 121, 122-23 (5th Cir.1978)."

80.    The following is a pertinent excerpt from US v. Blackmon, 839 F.2d 900 (2d Cir. 1988)

that presents a useful discussion about co-conspirators in conspiracies:

"This court has several times observed that statements "that apprise a coconspirator of the progress of a conspiracy," United States v. Rahme, 813 F.2d 31, 36 (2d Cir.1987), or that "brief [a coconspirator] on the scheme," United States v. Mangan, 575 F.2d 32, 44 (2d Cir.), cert. denied, 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978), are statements made in furtherance of a conspiracy. See United States v. Paone, 782 F.2d 386, 391 (2d Cir.1986), cert. denied, ___ U.S. ___, 107 S.Ct. 3261, 97 L.Ed.2d 761 (1987). See also United States v. Persico, 832 F.2d 705, 716 (2d Cir.1987). The Third Circuit has likewise observed that statements by coconspirators that "inform each other of the current status of the conspiracy further the ends of the conspiracy and are admissible so long as the other requirements of Rule 801(d)(2)(E) are met." United States v. Ammar, 714 F.2d 238, 252 (3d Cir.) (citations omitted), cert. denied, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983)."

81.    In Pangburn v. Culbertson, 200 F.3d 65 (2d Cir. 1999), the Court addressed conspiracies

to violate civil rights and a legal standard that governs whether litigants should be allowed to file

an amended pleading. In short, the excerpts from that case shown below confirm that Court ruled that **a)** "conspiracies are by their very nature secretive operations" that "may have to be proven by circumstantial, rather than direct, evidence" and **b)** though futility "is a valid reason for denying a motion to amend", that is "true only where it is "beyond doubt that the plaintiff can prove no set of facts in support" of his amended claims."

    a. "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."

    b. "While "conclusory allegations" of a § 1983 conspiracy are insufficient, _Dwares v. City of New York,_ 985 F.2d 94, 99-100 (2nd Cir.1993) (citing cases), we have recognized that such "conspiracies are by their very nature secretive operations," and may have to be proven by circumstantial, rather than direct, evidence. _Rounseville v. Zahl,_ 13 F.3d 625, 632 (2d Cir.1994)."

    c. "while "futility" is a valid reason for denying a motion to amend, _John Hancock Mutual Life Ins. Co. v. Amerford Int'l Corp.,_ 22 F.3d 458, 462 (2d Cir.1994), this is true only where it is "beyond doubt that the plaintiff can prove no set of facts in support" of his amended claims. _Ricciuti v. N.Y.C. Transit Auth.,_ 941 F.2d 119, 123 (2d Cir.1991)"

82.    The following are excerpts from _Vann v. City of New York_, 72 F.3d 1040 (2d Cir. 1995) that addresses municipal liability:

    a.    A § 1983 plaintiff injured by a police officer may establish the pertinent custom or policy by showing that the municipality, alerted to the possible use of excessive force by its police officers, exhibited deliberate indifference. _See, e.g., Fiacco v. City of Rensselaer,_ 783 F.2d 319 (2d Cir.1986), _cert. denied,_ 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987); _see id._ at 326-27 (municipality "should not take a laissez-faire attitude toward the violation by its peace officers of the very rights they are supposed to prevent others from violating").

    b.    To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious. _See Canton v. Harris,_ 489 U.S. at 390, 109 S.Ct. at 1205. An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to

forestall further incidents. *See, e.g., Ricciuti v. N.Y.C. Transit Authority,* 941 F.2d at 123; *Fiacco v. City of Rensselaer,* 783 F.2d at 328

83.      *Turpin v. Mailet,* 619 F.2d 196 (2d Cir. 1980) similarly addressed municipal liability as follows:

> "The allegations here clearly meet that standard.[4] We see no reason why an official policy cannot be inferred from the omissions of a municipality's supervisory officials, as well as from its acts. The issue of authorization, approval or encouragement is generally one of fact, not law. For example, where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts. See *Smith v. Ambrogio,* 456 F.Supp. 1130, 1136 (D.Conn.1978); *Popow v. City of Margate,* 476 F.Supp. 1237 (D.N.J.1979). Although that standard is undoubtedly difficult to meet, see *Lewis v. Hyland, supra; Smith v. Ambrogio, supra* at 1136, we cannot say as a matter of law that failure to act may never give rise to an official policy within the meaning of *Monell.*"

## **STATEMENT OF FACTS**

1.      I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

**Facts about the press conference that was conducted on 10/3/17 in front of City Hall that victims of NYPD abuse conducted and concerned reforming the NYPD as I was illegally prevented from attending it:**

1.      On 10/3/17, Defendants Baez, Hansen, and Mason all were personally involved in illegally prevented me from being able to observe a public forum that New York City Councilman Jumaane Williams and others held at noon in that same location that involved "taking a knee" in front of the main steps of City Hall in support of civil rights and reforming the NYPD. Mr. Baez was the first member of the NYPD who didn't let me attend that public forum, after I met him inside of the entrance to City Hall located by Park Row. After he told me, "You

know why" in response to my question to him about why I could not attend that public forum, I immediately headed to the entrance to City Hall located by Broadway, where I met both Mr. Hansen and Mr. Mason at the guardhouse located just inside of that entrance. Both of them also refused to let me attend that public forum, as they let others pass through that entrance toward City Hall. Due to their unlawful actions against me City Hall on 10/3/17, Mr. Baez, Mr. Hansen, and Mr. Mason all violated 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 245(b)(5), and my First and Fourteenth Amendment rights. The next screenshot is from a photograph that I took with my cell phone at 12:17 pm on 10/3/17. It shows Mr. Hansen standing next to the guardhouse located just inside of the Broadway entrance to City Hall while Mr. Hansen was illegally refusing to let me proceed to the public forum that New York City Councilman Jumaane Williams and others held in front of the steps that lead to City Hall.

2.      The next screenshot is from a video that I recorded with my cell phone at 12:25 pm on 10/3/17 while standing a short distance inside of the Broadway entrance to City Hall. It shows Mr. Mason standing next to the guardhouse located just inside of the Broadway entrance to City Hall while he was illegally refusing to let me proceed to the public forum that New York City Councilman Jumaane Williams and others held in front of the steps that lead to City Hall.



3.      The next screenshot was created from a video that I recorded with my cell phone at 12:25 pm on 10/3/17 while standing a short distance inside of the Broadway entrance to City Hall. It shows Mr. Mason standing next to the guardhouse located just inside of the Broadway entrance to City Hall while he was illegally refusing to let me proceed to the public forum that New York City Councilman Jumaane Williams and others held in front of the steps that lead to City Hall.



4.      The next screenshot is from a video that I recorded with my cell phone at 12:43 pm on 10/3/17 while standing a short distance inside of the Broadway entrance to City Hall and in front of the guardhouse located there.



5.      The video that screenshot is from was recorded as I clearly asked Mr. Hansen the following pertinent question about the public forum that New York City Councilman Jumaane Williams held on that date in front of the steps that lead to City Hall:

> "So Mr. Hansen…this meeting about "Take-A-Knee"….Can I please attend?"

6.      Instead of answering my question then, Mr. Hansen ignored it and walked into the nearby NYPD guardhouse.

**Facts about the Mayor's 10/4/17 Town Hall:**

1.      Everything that I have discussed thus far in this complaint about whistleblowing and litigation that I engaged in were matters about which I intended to engage in protected whistleblowing while attending the Mayor's 10/4/17 town hall largely to try to engage in word-

of-mouth advertising against the Mayor's administration and its business partners that I hoped would spread quickly, widely, and sufficiently enough as I hoped its sum and substance would persuade enough people to fire the Mayor in the 2017 New York City government elections that would give New Yorkers leadership instead all that the Mayor and his administration represent. By having New Yorkers throw out Bill de Blasio and his administration like a disease by the power of their votes, I hoped that new management at the Mayor's office would clean house across New York City's government and with its business partners to usher in proper governance. Among other things, that would require Urban's contract with HRA to be cancelled.

2.     On 10/4/17, I lawfully stood on a public sidewalk next to the school that hosted the Mayor's 10/4/17 town hall as I lawfully waited in a line with other members of the public to be issued an admission ticket for the Mayor's 10/4/17 town hall that would enable me to attend it from within the room in which it was conducted as it was conducted. While doing so, I distributed various literature that I had prepared and brought with me to members of the public nearby that contained factual information that was critical of the Mayor's administration, NYPD, the Mayors administration's business partners, and others. While doing so, those who I distributed that information to were appreciative of that. I also told several of them then that I was a whistleblower against the Mayor's administration, NYPD, HRA, business partners of the Mayor's administration, and others and that I then had ongoing litigation against HRA. I also told them then that I had illegally and repeatedly been prevented from attending town hall and resource fair meetings that the Mayor had been conducting with others while I had been conducting myself in a lawful manner and that I expected that I would again be prevented from doing so by being illegally prevented from attending the Mayor's 10/4/17 town hall.

3.     I recall that as I waited in that area before the Mayor's 10/4/17 town hall began,

Defendants John Doe1, Cortez, and Nick Gulotta all refused to issue me an admission ticket for that town hall and instead mostly ignored me as they issued admission tickets to others who were in the same line as me and in back of me for that town hall as they illegally discriminated against me in the process. As that occurred, I recall that I talked with both Defendant Hill and Bronx DA John Doe bodyguard about the fact that I was being illegally prevented from attending the Mayor's 10/4/17 town hall. Although I was aware then that both of them were required to intervene on my behalf to enable me to attend that town hall, neither of them made any attempt to do so.

4.      While I was being illegally prevented from attending that town hall, that was occurring in the immediate presence of the following additional defendants who also illegally didn't intervene to enable me to attend that public forum:

Defendants Mason, Hansen, Dean, Finnel, Nieves.

5.      The next screenshot is from a video recording that I recorded on 10/4/17 at 7:23 pm that shows Defendant Mason as he made a hand gesture toward me that is clearly known to mean to stay away. He made that gesture to me as he stood just inside of the entrance to the school that hosted the Mayor's 10/4/17 town hall. Defendant Hansen is also partially shown in this screenshot as he was illegally preventing me from entering that school to attend the Mayor's 10/4/17 town hall.



6.      The next screenshot is from a video recording that I recorded on 10/4/17 at 6:55 pm that shows Defendant Mason as he and Defendant Hansen stood near one another just inside of the entrance to the school that hosted the Mayor's 10/4/17 town hall while they were aware that I was being prevented from attending that town hall while I was conducting myself lawfully as they illegally made no attempt to allow me to attend that public forum.



7.      The next screenshot is from a photograph that I took on 10/4/17 at 6:57 pm that shows

Defendants Nieves, Mason, and Hansen as they stood near one another just inside of the entrance

to the school that hosted the Mayor's 10/4/17 town hall while they were aware that I was being

prevented from attending that town hall while I was conducting myself lawfully as they illegally

made no attempt to allow me to attend that public forum. Mr. Nieves is partially shown on the

left in that screenshot. Defendant Dean appears on the far-right in that screenshot and also

illegally then didn't intervene on my behalf.



8.      The next screenshot is from a video recording that I recorded on 10/4/17 at 6:03 pm that shows Defendant Hill as she and I stood in front of the entrance to the school that hosted the Mayor's 10/4/17 town hall. I was then pointing out to her that I was again illegally being prevented from attending a public forum then and there that the Mayor was about to conduct as I was referring to the Mayor's 10/4/17 town hall. This screenshot clearly shows her NYPD badge.



9.      The next screenshot is from a video recording that I recorded on 10/4/17 at 6:55 pm that

shows Defendant Gulotta in the top-left corner while he was inside of the school that hosted the

Mayor's 10/4/17 town hall after he had previously been outside of it on that date and was among

others who were involving in granting members of the public access into that school to attend

that town hall while illegally bypassing me for that same purpose in violation of my

constitutional rights to attend that town hall.



10.     Mr. Gulotta was previously involved in treating me exactly like that at earlier town hall

meetings that the Mayor conducted. He did so previously on 6/8/17 at the site of the Mayor's

town hall then. He was also present on 4/27/17 at the site of the Mayor's town hall while I was

being illegally prevented from attending it by Defendant Redmond and others while Mr. Gulotta

was aware of that and illegally didn't try to intervene on my behalf to enable me to attend that

town hall. That occurred after I had registered in advance to attend that 4/27/17 town hall during

a telephone conversation that I had with him a few days prior to 4/27/17.

11.     To close out this section, it is worth pointing out that the New York City 2017 general

elections were held in November of 2017 and likely heavily factored into the decisions that were

made to commit the illegal acts and omissions against me on 10/3/17 and 10/4/17 in relation to

my efforts to have lawfully attended the public forums that this complaint concerns to minimize,

marginalize, and murder my First Amendment and Fourteenth Amendment right to lawfully

assassinate the character of the Mayor, members of his NYPD security detail, Mr. Banks, other

personnel of HRA, and others as they ran for re-election and otherwise stood to benefit from Bill

de Blasio being re-elected as New York City's Mayor. The timing of the illegal acts that

continued to be perpetrated against me on 10/3/17 and 10/4/17 truly matters in that sense.

## CAUSES OF ACTION

**CLAIM #1:** **Violations of the First Amendment right of access to a public forum, to protest in a public forum, to record audio and video recordings in a public forum, to take photographs in a public forum, to receive information in a public forum, to have the opportunity to talk with journalists in a public forum, to distribute whistleblowing literature in a public forum, to engage in lawful assembly in a public forum, to engage in freedom of expression in a public forum, to otherwise engage in whistleblowing and criticism of government officials in a public forum, to engage in expressive association, and to petition government officials in a public forum for redress of grievances**

**(Against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.  I also incorporate by reference as though fully set forth herein the decision that was issued on 5/19/20 in *Dunn v. City of Fort Valley,* No. 19-cv-287(TES) (M.D. Ga. May 19, 2020) due to relevant findings it contains about First Amendment rights in public forums, supervisory liability, and other pertinent things.

3.  My right to lawfully protest in a public forum in a manner that doesn't disrupt how that public forum is conducted while valid time, place, and manner restrictions do not exist to prohibit such protest in a public forum was acknowledged the following remark that Judge Schofield expressed in the decision that she issued in *Gonzalez v. City of New York*, No. 14

Civ. 7721 (LGS) (S.D.N.Y. Sept. 29, 2016):

> "Two branches of First Amendment claims are relevant to the present case: (a) interference with the right to protest in a public forum and (b) retaliation for exercising First Amendment rights."

4. More importantly, my right to lawfully protest in a public forum in a manner that doesn't disrupt how that public forum is conducted while valid time, place, and manner restrictions do not exist to prohibit such protest in a public forum was confirmed by the following excerpt from _Occupy Nashville v. Haslam_, 949 F. Supp. 2d 777 (M.D. Tenn. 2013):

> "a state may not restrict First Amendment rights, absent valid time, place, or manner restriction. _See Dean,_ 354 F.3d at 551; _Galvin v. Hay,_ 374 F.3d 739, 751 (9th Cir.2004) (**As speakers may generally control the presentation of their message by choosing a location for its importance to the meaning of their speech, speakers may ordinarily— absent a valid time, place and manner restriction—do so in a public forum.");** **_Childs v. Dekalb Cnty., Ga.,_ 286 Fed.Appx. 687, 693-94 (11th Cir.2008)** (denying qualified immunity and stating that, based on Supreme Court precedent, "police officers have known for decades that protestors present on public property have a First Amendment right to peacefully express their view, in the absence of narrowly tailored ordinances restricting the time, place, or manner of the speech")."

> (boldface formatting added for emphasis)

5. Due to the facts and circumstances that I have discussed at length and with sufficient specificity in this pleading, I have decisively established that the Defendants identified above that this claim concerns were personally involved in having willfully, callously, and wantonly illegally violated my First Amendment rights in relation to my efforts to have attended the Mayor's 10/4/17 town hall and the 10/3/17 12 pm press conference in front of City Hall's steps.

6. I have further established that the defendants that this claim concerns violated my First Amendment right of access to public records that were made available in the building that hosted the Mayor's 10/4/17 town hall that were made available strictly to the members of the public who were permitted to attend that town hall.

7. Ms. Ramos is also liable for this cause of action due to her role as co-conspirator in that conspiracy as she illegally deceived Ms. Durkin on 6/28/17 and 6/29/17 in e-mail messages that she sent to Ms. Durkin about me and the illegal acts that continued to be illegally committed against me on 10/4/17 and prevented me from being able to lawfully attend the Mayor's 10/4/17 town hall. Ms. Ramos sent those e-mail messages to Ms. Durkin about me in furtherance of a fraudulent scheme to try to illegally cover-up such illegal acts and omissions that were committed against me. Relevant findings that support this assertion about Ms. Ramos' liability exist in the decisions that were issued in *US v. Blackmon*, 839 F.2d 900 (2d Cir. 1988), *Escalera v. Samaritan Village Men's Shelter*, No. 17-cv-4691 (CM) (S.D.N.Y. Sept. 27, 2019), *US v. Basey*, 816 F.2d 980 (5th Cir. 1987), *Vann v. City of New York*, 72 F.3d 1040 (2d Cir. 1995), *Pangburn v. Culbertson*, 200 F.3d 65 (2d Cir. 1999), and *Dunn v. City of Fort Valley,* No. 19-cv-287(TES) (M.D. Ga. May 19, 2020).


**CLAIM #2:**      **First Amendment Retaliation and Viewpoint Discrimination**

**(Against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.)**

1. I incorporate by reference the information presented in the preceding paragraphs as though fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.


**CLAIM #3:**          **Violations of the Fourth Amendment**

**(Against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #4:**            <u>**Violations of the Fifth Amendment**</u>

**(Against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #5:**            <u>**Violations of the Fourteenth Amendment**</u>
            <u>**Substantive Due Process Rights**</u>

**(Against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #6:**            <u>**Violations of Procedural Due Process**</u>

**(Against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #7:**                **Violations of the Fourteenth Amendment**
                                **Equal Protection Rights**

**(Against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #8:**                **Violations of the Fourteenth Amendment**
                                **Prohibitions Against Selective-Enforcement**

**(Against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #9:**                **Failure to Intervene in Violation of the**
                                **Fourteenth Amendment**

**(Against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de Blasio, O'Neill, Redmond,**

**Carrion, Vance, Jr., and Byrne, Jr.)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.


**CLAIM #10:**                    **Failure to Train and Supervise**

**(Against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.


**CLAIM #11:**      **Violation of the New York State's Open Meetings Law**

**(Against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.


**CLAIM #12:**                    **Abuse of Process**

**(Against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #13:** <u>**Deliberate Indifference**</u>

**(Against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #14:** <u>**Fraudulent Misrepresentation and Fraudulent Inducement**</u>

**(Against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #15:** <u>**Violation of New York State General Business Law 349**</u>

**(Against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set

forth herein.

2.  The defendants that this claim concerns are liable for it due to the information that I
    presented in this complaint.

### CLAIM #16:                          <u>Negligence</u>

**(Against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set
    forth herein.

2.  The defendants that this claim concerns are liable for it due to the information that I
    presented in this complaint.

### CLAIM #17:                          <u>Municipal Liability</u>

**(Against Defendant City of New York)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set
    forth herein.

2.  Defendant City of New York is liable for this claim due to the information that I presented in
    this complaint.

### CLAIM #18:          <u>Intentional and Negligent Infliction of Emotional Distress</u>

**(Against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set
    forth herein.

2.  The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.

**CLAIM #19:**              **Conspiracy to Violate Civil Rights and**
                              **Cover-Up Such Abuse**

**(Against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #20:**                      **Unjust Enrichment**

**(Against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #21:**                **Public and Private Nuisance**

**(Against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I

presented in this complaint.

**CLAIM #22:**  **Violations of the Hatch Act (see 5 U.S.C. §1502(a)(1))**

**(Against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

## **DEMAND FOR A JURY TRIAL**

1. I demand a trial by jury in this action on each and every one of my damage claims.

## **PRAYER FOR RELIEF**

WHEREFORE, this Court should accept jurisdiction over this entire matter and grant me additional relief by:

1. Causing this Court to exercise supplemental jurisdiction over my X1 lawsuit, my X2 lawsuit, my X3 lawsuit, my X4 lawsuit, and my X5 lawsuit before then consolidating them with this action that will result in having this action to control how all of that litigation is conducted. This request stems from a common nucleus of operative fact and is pursuant to FRCP Rule 42.

2. Empaneling a jury to hear and decide this case strictly on its merits.

3. Granting me the following additional relief against the defendants individually and jointly:

   a. Compensation for violations of my constitutional rights, defamation, abuse of process, nuisance, unjust enrichment, wire fraud, and fraudulent misrepresentations as well as

pain, suffering, mental anguish, and humiliation that I experienced due to the illegal acts and omissions by the defendants.

b.  Declaratory, injunctive, and equitable relief through the issuance of an order that voids the results of the 2017 New York City government elections for the jobs of New York City Mayor, New York City Councilmember, Bronx District Attorney, Queens Borough President, New York City Comptroller, and New York City Public Advocate primarily because it is reasonable to believe that results of those elections were materially tainted by voter fraud, voter suppression, and whistleblower retaliation in violation of 5 U.S.C. §1502(a)(1) that occurred partly by illegally:

  i.  Preventing whistleblowers from attending public forums that the Mayor conducted with them and were partly used as campaign events to attract various types of support from voters and prospective voters.

  ii.  Segregating and discriminating against whistleblowers at such public forums.

c.  Declaratory, injunctive, and equitable relief in accordance with findings expressed in _Capitol Records, Inc. v. Thomas-Rasset_, 692 F.3d 899 (8th Cir. 2012) through the issuance of an order that enjoins Defendant City's personnel and agencies from continuing to commit illegal acts and omissions against me that violate my rights.

d.  Further declaratory, injunctive, and equitable relief through the immediate issuance of an order that:

  i.  Prohibits all members of the NYPD from deliberately making any physical contact with me while I am conducting myself in a lawful manner.

  ii.  Requires all members of the Mayor's NYPD security detail to not come within 10 feet from me while they are on-duty as members of the Mayor's NYPD

security detail and I am conducting myself in a lawful manner, unless I explicitly grant consent for that to occur.

iii. Requires all members of the Mayor's CAU to not come within 10 feet from me while I am conducting myself in a lawful manner and they are on-duty as members of the Mayor's CAU, unless I explicitly grant consent for that to occur.

iv. Prohibits Defendant City's personnel from illegally interfering with my ability to attend public forums that the Mayor may conduct from within the room in which he does so as he does so.

v. Prohibits Defendant City's personnel from illegally interfering with the rights that other people have to lawfully attend public forums that the Mayor conducts that may allow others and I to exercise our First Amendment right to observe, hear, and enjoy lawful speech and other expression that such people may engage in to criticize the Mayor and others during them.

vi. Prohibits Defendant City's personnel from illegally interfering with the First Amendment and Fifth Amendment rights that people have to **a)** bring literature and signs with them into rooms in which the Mayor conducts public forums, **b)** lawfully distribute such literature during those meetings without disrupting those meetings, **c)** distribute such literature and otherwise show it and signs in the rooms in which the Mayor conducts such meetings before they begin and after they end, and **d)** Keep such literature and signs with them as the Mayor conducts such public forums.

vii. Requires Defendant City to grant access to public forums that the Mayor

conducts inside of buildings based on the order in which members of the public line up directly outside of those buildings shortly before those meetings begin to be granted access to the room in which the Mayor conducts such public forums on those dates.

viii. Prohibits Defendant City from allowing its personnel to prevent members of the public from attending public forums that the Mayor conducts inside of buildings from within the rooms in which he does so while sufficient seating is available in those rooms.

ix. Orders Defendant City to immediately cause all members of the NYPD who are present in areas where the Mayor conducts public town hall meetings, public resource meetings, public hearings, and press conferences that the public may observe to wear body-cameras that are always on and always recording both audio and video recordings.

x. Orders Defendant City of New York to provide all audio and video recordings from such body-cameras in unedited and non-redacted form along with their audit trail records to allow for an independent forensic analysis within 24 hours of any adverse encounter that occurs between **a)** members of the public and **b)** the members of the NYPD wearing those body-cameras.

xi. Orders Defendant City to immediately **a)** cause clear audio recordings to be recorded of all verbal communications that members of the NYPD have while they are on-duty as members of the NYPD and present in areas where the Mayor conducts public town hall meetings, public resource meetings, public hearings, and press conferences that the public may observe.

xii.   Orders Defendant City of New York to provide all such audio recordings in unedited and non-redacted form that includes information that identifies the date and time when those recordings began to be recorded as well as the speakers heard in those communications that are personnel of Defendant City within 24 hours of any adverse encounter that occurs between **a)** members of the public and **b)** the members of the NYPD heard in those audio recordings while they are being recorded.

xiii.   Orders Defendant City to immediately cause all other electronic communications (such as e-mail messages, cell phone text messages, and encrypted communications) that are engaged in by those who are part of the Mayor's NYPD security detail to be recorded and preserved for possible use in litigation by people that they commit illegal acts and omissions against.

xiv.   Orders Defendant City to provide all such electronic communications within 24 hours in unedited and non-redacted form that includes information that identifies the date and time when those communications occurred and the identities of those who engaged in them to members of the public who have adverse encounters with members of the Mayor's NYPD security detail to the extent that those communications concern those adverse encounters.

xv.   Orders Defendant City to provide me copies of all communications that its personnel have had about me since 2/1/16 in unedited and non-redacted form. This includes, but is not limited to all of the following:

1)   All communications that have taken place by using personally-owned devices, personal e-mail accounts, personal encrypted messaging

accounts, and personal cell phone plans as well as by using computers and other devices that are owned or leased by Defendant City and e-mail, cell phone, and encrypted messaging accounts that are administered and/or controlled by Defendant City.

e. Further declaratory, injunctive, and equitable relief through the immediate issuance of an order that:

    i. Orders Defendant City to immediately cause the CCRB and DOI to be provided all video recordings within 24 hours after a complaint is reported to them about illegal acts and omissions that are committed by members of the NYPD and other personnel of Defendant City that are recorded by video security cameras that Defendant City controls. This includes, but is not limited to illegal acts that are related to public forums that the Mayor conducts and occur on the dates and at the locations where the Mayor conducts them.

    ii. Further orders Defendant City to make those video recordings available within 24 hours in unedited and non-redacted form to those who report such illegal acts and omissions to the CCRB and DOI.

    iii. Orders that the following Defendants are also required to be fired at the earliest possible instead of practical or convenient time from the jobs that they hold with Defendant City of New York largely pursuant to Section 1116 of the New York City Charter in response to the illegal acts and omissions that they committed against me in relation to my efforts to have lawfully attended **a)** the Mayor's 10/4/17 town hall and **b)** the 10/3/17 public forum that was conducted in front of City Hall's steps at 12 pm and that they are prohibited from being

employed by Defendant City again:

> Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1
> 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de
> Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.

iv.  Orders the following defendants to immediately and fully reimburse the City of

New York with pre-judgment and post-judgment interest for the total value of

pay and benefits that they received that directly correspond to the length of time

during which they were involved in the illegal acts and omissions that were

committed against me in relation to my efforts to have lawfully attended **a)** the

Mayor's 10/4/17 town hall and **b)** the 10/3/17 public forum that was conducted

in front of City Hall's steps at 12 pm:

> Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1
> 10/4/17, Bronx DA John Doe bodyguard, Nieves, Gulotta, Ramos, de
> Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr.

v.  Restrains Defendant City's personnel and agencies from continuing to commit

illegal acts and omissions against me that violate my rights, especially in all

areas that are public forums.

vi.  Declares that the ban that the Mayor announced that prohibits large gatherings

of people in New York City and protests from being conducted is overly broad,

pretextual, void, and unenforceable largely because it impermissibly violates

core First Amendment rights as well as Fifth Amendment and Fourteenth

Amendment rights that pertain to due process, selective-enforcement, equal

protection, and liberty.

vii.   Further declares that though it may possibly be advisable to wear a face mask

in New York City, no one is required to do so partly because doing so impedes

the flow of oxygen to healthy people and impermissibly infringes upon the First Amendment rights that people have to engage in freedom of expression, such as by having people see them smiling, expressing affection by kissing, being able to yawn without having to wear a face mask, and having other facial expressions that they make seen by others. Although it is potentially dangerous to one's health to engage in a wide variety of other activities that include driving a car because of the possibility that a drunk driver may pass by and having a drink in a bar because there is a possibility to breathe in second-hand smoke, bans on driving and visiting bars have not been imposed due to such risk factors.

viii.   Similarly declares that the social-distancing restrictions in New York State are overly broad, void, and unenforceable for the same reasons just discussed and declares that those restrictions have been selectively-enforced by the NYPD in violation of the Fourteenth Amendment.

f.   Declaratory relief by declaring that the Mayor's 10/4/17 town hall was a public forum that was subject to New York State's Open Meetings Law and that all actions that were taken in relation to that public forum are void pursuant to Section 107 of New York State's Public Officer Law because that public forum was conducted in violation of New York State's Open Meetings Law.

g.   Injunctive and equitable relief by ordering Defendant City to immediately provide me the following in unedited and non-redacted form:

i.   Copies of all video recordings and photographs that were recorded and otherwise taken by Defendant City's personnel inside of the building that

hosted the Mayor's 10/4/17 town hall between the time when **a)** the first member of the public entered that building on that date in relation to attending that public forum and **b)** everyone who attended that public forum exited that building on 10/4/17.

ii. Copies of all video recordings and photographs that were recorded and otherwise taken by Defendant City's personnel in the areas where I interacted with Defendants Baez, Mason, and Hansen on 10/3/17 by City Hall while they illegally refused to let me enter City Hall's compound to attend the 12 pm press conference on that date in front of City Hall's steps that I have discussed in this complaint.

iii. Copies of all records that have been in the possession of Defendant City's personnel that pertain to the deliberations, planning, coordination, execution, and cover-up that took place in regards to my having been illegally prevented from attending the Mayor's 10/4/17 town hall and the 10/3/17 12 pm press conference in front of City Hall's steps.

iv. Copies of all records that have been in the possession of Defendant City's personnel that describe staff assignments that were issued to the members of the Mayor's staff, the Mayor's CAU, the members of the Mayor's NYPD security detail, and the other members of the NYPD who were assigned work to do in relation to the Mayor's 10/4/17 town hall.

v. Copies of all records that have been in the possession of Defendant City's personnel that consist of the names and contact information for the members of the public who registered to attend the Mayor's 10/4/17 town hall as well as

the names and contact information for the journalists who attended that town hall.

h. Injunctive and equitable relief by ordering Defendant City of New York to immediately provide me all video recordings as an ".avi", ".mp4", or ".mov" computer file that were recorded on 2/19/20 by all video security cameras that were installed in the school and are controlled by DOE that hosted the town hall meeting that the Mayor conducted on that date between the times when the first member of the public was allowed into that school for the purpose of attending that town hall until everyone who attended that town hall exited that school.

i. Compensation for all costs and attorney fees that are related to my pursuit of this civil action.

j. Equitable and injunctive relief that authorizes me and others that I may ask to help me to paint, write, or draw any message or image of any size indefinitely throughout New York City without needing pre-approval from anyone on any public street, sidewalk, public passageway, concourse, and park indefinitely by using resources that will be provided to me by the City of New York for that purpose.

k. Equitable and injunctive relief that orders the City of New York to cause its NYPD to accord whatever messages and images that I may paint, write, or draw in public areas throughout New York City to receive equal law-enforcement protection that is accorded to Black Lives Matter signs on streets in New York City, especially the one located in front of Trump Tower in Manhattan.

l. An award of damages against Defendants City of New York, Mason, Baez, Hansen, Dean, Finnel, Hill, Cortez, John Doe1 10/4/17, Bronx DA John Doe bodyguard, Nieves,

Gulotta, Ramos, de Blasio, O'Neill, Redmond, Carrion, Vance, Jr., and Byrne, Jr. pursuant to 18 U.S.C. §1986 for having not intervened on my behalf in relation to my effort to have attended the Mayor's 10/4/17 town hall and the 10/3/17 12 pm press conference that was conducted in front of City Hall's steps.

m. An award of damages against Defendants Mason, Baez, Hansen, Dean, Finnel, Hill, Bronx DA John Doe bodyguard, Nieves, O'Neill, Redmond, Vance, Jr., and Byrne, Jr. pursuant to New York State General Business Law §349 for deception in relation to my efforts to have attended the Mayor's 10/4/17 town hall and the 10/3/17 12 pm press conference that was conducted in front of City Hall's steps with respect to how those defendants conducted themselves as criminal accomplices instead of the law-enforcement personnel that they technically were on 10/3/17 and 10/4/17.

n. An award of punitive damages for all of my claims set forth in this pleading.

o. An award of pre-judgment and post-judgment interest.

p. Declares that the Mayor's 10/4/17 town hall was illegally conducted inside of a public school.

q. Equitable and injunctive relief that orders the City of New York to remove all obstructions from public sidewalks, public streets, public parks, and public concourses that include traditional public forums within 24 hours that the NYPD and Mayor's office has set up and otherwise allowed to exist on them and to not setup such obstructions again in such public areas nor otherwise allow them to exist on and in them without prior approval by this Court. The existence of such obstructions on sidewalks violates New York City Administrative Code §16-122(b). Also, such obstructions impermissibly infringe upon and otherwise burden the First Amendment rights that people have to

lawfully walk, bicycle, and otherwise freely move about and congregate in such areas –
especially on sidewalks and in parks that are traditional public forums – while some who
seek to do so may have various disabilities that include blindness and physical ailments.
Allowing such obstructions to exist on public sidewalks, in public streets, in public parks,
and on public concourses in New York City is clearly inequitable and quite literally an
insult to injury with respect to my claims in this action that largely concern illegal acts
and omissions that were committed against me while no pandemic existed in New York
City that prevented me from lawfully attending public forums. It is patently inequitable to
my countervailing interest and ability to lawfully exercise my constitutional rights on
public sidewalks and in parks to be curtailed by the NYPD and Mayor's administration
during the ongoing Coronavirus pandemic to accommodate such things as outdoor dining
after the NYPD and Mayor's administration flagrantly, willfully, criminally, and
repeatedly violated my constitutional rights to lawfully attend public forums inside of
buildings that the Mayor and other government officials conducted. In the same way that
I took a risk that I would be illegally prevented from lawfully attending such public
forums that the Mayor conducted while no pandemic existed in New York City as I
visited the sites where those public forums were conducted on the dates when they were
conducted, the owners of restaurants and other businesses that would benefit by being
able to expand their operations on public sidewalks and in public parks in New York City
at the expense of my First Amendment, Fifth Amendment, and Fourteenth Amendment
rights to freely make use of all areas on such public sidewalks and public parks that are
traditional public forums took a risk that circumstances beyond their control would
possibly arise that would materially and repeatedly disrupt their ability to operate their

businesses. A reasonable, equitable, and creative accommodation may be made for owners of businesses that wish to conduct their operations outside by having this Court order the immediate bulldozing of City Hall; the NYPD headquarters, precincts, and training facilities, and Gracie Mansion to allow such businesses to promptly expand their operations on account of the fact that those locations have been the primary sanctuaries of mobsters dressed as government officials and members of the NYPD that committed illegal acts and omissions that rigged and stole the 2017 New York City government elections through voter suppression, voter fraud, whistleblower retaliation, and terrorism that persists against New Yorkers.

r.   Equitable relief that will have this Court adopt the practice in _USA v. Donziger_, No. 11-cv-0691(LAK)(RWL)(S.D.N.Y.) to similarly appoint private prosecutors to commence criminal prosecutions against the defendants that this action concerns in response to criminal acts and omissions that they committed and/or condoned against me that are addressed in this complaint to remedy the fact that prosecutors have negligently refused to do so.

s.   Declares that New York City has proven to be and remains an anarchist jurisdiction largely because of illegal acts and omissions that the defendants in this action criminally perpetrated in New York City in relation to the constitutional rights that people have to lawfully attend and participate in public forums in New York City.

t.   Such other, further, and different relief as the interests of justice and equity may require.

Dated:          New York, New York
                January 25, 2021

From,


s_/Towaki Komatsu

*Plaintiff, Pro Se*
802 Fairmount Pl., Apt. 4B
Bronx, NY 10460
(347) 872-1205
Towaki_Komatsu@yahoo.com

# Exhibit A



## Council Member Ritchie Torres
with Borough President Ruben Diaz Jr.
U.S. Representative José E. Serrano
& State Senator Gustavo Rivera
present

## WORKING FOR **COUNCIL DISTRICT 15**



# TOWN HALL

- with -

# Mayor Bill de Blasio

**WEDNESDAY,** October 4TH at 7pm
DOORS OPEN AT 6:00PM AND CLOSE AT 7:30PM

## IS 254
2452 Washington Avenue, Bronx, NY 10458
(Between 188th and 189th Streets)

**Space is limited - please RSVP by October 2nd at 5PM**



TOWN HALL CO-SPONSORS

**BRONX COMMUNITY BOARD** 6
**MONTEREY** Houses
**48TH PRECINCT** Community Council
**TWINS PARKS** West
**TREMONT UNITED** Methodist Church

## TO RSVP
**Visit:** www.nyc.gov/cd15townhall
**Email:** townhallrsvp@cityhall.nyc.gov
**or Call:** (212) 788-6732

ACCESS PROVIDED:

Please contact us if you have any additional accessibility needs.